**John CHAMBERLAIN, Plaintiff,**

v.

**BISSELL INC., a Michigan corporation, Defendant.**

**No. G 80–901 CA 1.**

United States District Court,
W. D. Michigan, S. D.

July 15, 1982.

Ward, Schenk & Boncher by Gary P. Schenk, Grand Rapids, Mich., Law Offices of Connye Y. Harper by Connye Y. Harper, Detroit, Mich., for plaintiff.

Warner, Norcross & Judd by Roger M. Clark, Robert J. Chovanec, Grand Rapids, Mich., for defendant.

## OPINION

MILES, Chief Judge.

### FINDINGS OF FACT

The plaintiff, John Chamberlain, was hired by Bissell Inc. in 1956. During the last half of the 1950's Bissell underwent a significant expansion at which time it hired a number of management level personnel. Chamberlain was one of these.

During most of his 23 years at Bissell, Chamberlain received good to excellent performance evaluations and received regular promotions. By 1970 he was designated as Manager of Manufacturing Engineering and remaining in that position until his termination in 1979. Chamberlain did not have a college degree and had learned his

engineering skills on-the-job, through self-study, and by taking some specialized courses and seminars. As Manager of Manufacturing Engineering, Chamberlain's duties included recommending, developing, and administering the plant incentive system, supervision of production methods and standards, providing cost estimates on new or changed products, coordination with the Product & Process Engineering department, directing development of cost data and routings on new or changed products, evaluation and layout of plant facilities, direction of the Plant Maintenance Department, and serving as advisor to other divisions of the company for special engineering projects. During the period 1974 to 1979 Chamberlain was involved in at least three special projects, one in Ireland, and two involving acquisitions of smaller companies, Atlantic Precision in New York City, and Penn Champ in Pennsylvania. During 1978–79 Chamberlain was responsible for transferring the operations of Atlantic Precision to the Bissell plant in Grand Rapids and then retransferring them to a new facility in Grand Rapids which Bissell purchased for that purpose.

Beginning in 1974 Chamberlain's immediate supervisor was William Sytsema who became Vice President of Manufacturing in that year. Chamberlain had considered himself a candidate for the position of Vice President and was disappointed when he did not receive the appointment.

Sytsema evaluated Chamberlain's performance in 1975, 1976, 1977, and 1978. Evaluations were done in approximately June of each year. Sytsema generally made positive comments about Chamberlain's performance, but had reservations in some areas. For instance, in 1975 he wrote that "Supervision is not a strong point of John's." Sytsema also noted that Chamberlain was "working with a reduced staff" which supports Chamberlain's testimony that some of his problems from 1974–79 were created by inadequate engineering personnel.

The 1976 evaluation was uniformly good and Sytsema lauded Chamberlain's "ability to get along with people." Sytsema noted, however, that he needed to be "more creative and more of a self motivator."

The 1977 evaluation was also generally good. In the section of the evaluation form reserved for needed improvements Sytsema wrote, "Must be on top of all operations and be creative."

In 1978, the year before Chamberlain was terminated, Sytsema noted that Chamberlain had suggested changes in the plant incentive systems but that these had not been approved. There is no indication as to the exact nature of these recommended changes. Other areas were rated good, but regarding evaluation and layout of plant facilities, Sytsema noted, "Need more imagination regarding changes. Do *not* resist change." With regard to special projects Sytsema noted, "Excellent performance on Atlantic Precision project. Good follow thru [sic] on all details." Sytsema found Chamberlain to be "generally very effective in dealing with peers. Sometimes is very critical." He felt that Chamberlain "should push harder on his ideas and be more demanding of his people."

Sytsema consistently gave Chamberlain high ratings in the performance of his cost estimation duties. The evaluations overall portray an individual who performed the technical aspects of his job very well. They also portray someone lacking in creativity and leadership, motivational, and supervisory qualities.

In October, 1978 Dale Miller was transferred from his position as Vice President of Administration to become Vice President of Manufacturing, replacing Sytsema. Chamberlain's previous disappointment degenerated to bitterness in not being named to the Vice President position. At this time Chamberlain was 50 years old. Miller was approximately 54 years old. Miller and Chamberlain had started their careers at Bissell on the same day in 1956. Chamberlain reacted to Miller's promotion as peer rivalry.

At the meeting at which Miller's appointment was announced Chamberlain left the meeting as soon as the announcement was

made. Miller was aware that Chamberlain was unhappy about his appointment as Vice President. The day after taking over as Vice President, Miller had a meeting with Chamberlain, as well as the other managers and supervisors in the manufacturing department, to discuss certain problems which Miller believed existed in the engineering department. Chamberlain refused to discuss these perceived problems, his response being that there were no problems.

During his tenure as Vice President of Administration, Miller had come to believe that there were deficiencies in the Engineering Department. He had observed, during the six to eight years prior to his switch to manufacturing, that there had been very little progress in the development of new manufacturing processes as compared to previous years. He had also received complaints about the morale in the engineering department and he believed that a morale problem existed. Such were the kinds of problems which Chamberlain refused to discuss.

Chamberlain's attitude toward the company and his job changed markedly during the year after Miller became Vice President. Most people who observed the change attributed it to his failure to be named Vice President.

Roger Taylor had been Product and Marketing Planning Manager for Bissell since 1965. In this capacity Taylor depended on Chamberlain's department for providing cost estimates on new products. He observed a radical change in Chamberlain's attitude and cooperation in providing costing figures after October 1978. Information which was readily available before was now unavailable. Taylor reported these problems to Miller who, in turn, talked to Chamberlain about them. Chamberlain attributed such problems to understaffing, but this explanation did not explain the sudden change in 1978. Miller felt it necessary to begin screening requests for cost estimates to insure that needed estimates were made.

Taylor was also chairman of the Product Planning Committee of which Chamberlain was a member. At one of the meetings of the Committee, after Miller became Vice President and at which Miller was present, Taylor raised a question about a cost estimate provided by Chamberlain's department. Chamberlain became incensed and disrupted the meeting by shouting, either saying or implying that Taylor was a liar. Miller immediately went to Chamberlain's office after the meeting and advised him he would not tolerate such a disruptive outburst again. Chamberlain's response was that if he could not express his opinion then perhaps he should not be on the Committee. Miller told him, "John, it's an essential part of your job. If you don't have to be on the Product Committee, I don't need you." A bitter and unhappy Chamberlain remained on the Committee.

Wayne Klinkner has been Personnel Manager at Bissell since 1972. He also observed that Chamberlain became very antagonistic during the last year of his employment. Klinkner had received numerous complaints from production workers regarding perceived inequities in the production incentive rates. Chamberlain was resistant and uncooperative regarding review and modifications of the incentive rates. Klinkner found it necessary to have meetings with the whole production line to resolve these problems and twice had to overrule Chamberlain's decisions. Such production line meetings were uncommon.

Miller was also aware of the problems regarding incentive rates. The incentive rates were based on production levels over and above a standard base rate. Base rates had to be established for each area of production. Two problems existed with respect to these rates. First, there was great variation in production levels relative to the base rates between different production areas. Production levels varied from 125% to 190% of the base rates. These inequities created morale problems among the production workers and many employees complained about the standards which had been set for their area. This was the problem area which concerned Klinkner. Secondly, the average production level was 170% of

the base, whereas Miller felt that it should be 125% to 135%. He therefore instructed Chamberlain to increase the base rates to achieve that result. Chamberlain's response was that the changes Miller wanted were not possible. Miller found this unacceptable. Since Chamberlain's termination those changes have been made.

Other persons noticed a change in Chamberlain's attitude and job performance. Donald Kalkofen has been foreman of Plant Maintenance since approximately 1970. As such, he was under Chamberlain's direct supervision and was a good friend of Chamberlain's. He observed a major change in the way Chamberlain worked with him in 1978. Chamberlain no longer helped him with his work problems. The changed relationship was significant enough to prompt Kalkofen to discuss the problem with Chamberlain, telling him that he did not care to work under the conditions then existing. Prior to that time Kalkofen felt that Chamberlain's performance had been excellent.

Clayton Burkholder was also a friend of Chamberlain's and had regular contact with him, on the job, as Quality Control Manager. In the year before Chamberlain's termination Burkholder observed that Chamberlain had become very arrogant and critical of everyone in the company, particularly of higher level management. Burkholder attributed this attitude to Chamberlain's failure to get the job as Vice President of Manufacturing. Burkholder did not personally have problems working with Chamberlain but he nevertheless was sufficiently concerned by Chamberlain's attitude to warn him about it. Burkholder told Chamberlain that he was being too critical and arrogant and that he might be discharged. Chamberlain's response was that that might be a good thing, "I don't know why they haven't fired me before."

Shortly after his termination Chamberlain received two unsolicited letters from other employees at Bissell. Mary Burggraaf, a corporate secretary, wrote on October 19, 1978 saying that she considered Chamberlain one of the best of Bissell's executives and implying that Chamberlain had not been given the opportunity to do his job properly. Marjorie Freeman, a clerk in the engineering department, wrote Chamberlain saying that engineering was a good place to work while Chamberlain was there and wishing him luck for the future. Neither of these employees had a cooperative working relationship with Chamberlain similar to that of Taylor, Kalkofen, or Burkholder, and neither had the responsibility of evaluating the quantity or quality of his work.

In June, 1979 Miller completed Chamberlain's annual evaluation and had an evaluation meeting with Chamberlain in accordance with company policy. On the evaluation form Miller noted some areas in which Chamberlain's performance was "good," "capable," or "fair." Each of these was qualified in some way. Regarding the incentive systems Miller noted, "Have talked to John several times about better incentive systems but no action." Regarding evaluation and layout of plant facilities Miller wrote "Little results in this area." He also noted a need for more involvement in the Penn Champ and Atlantic Precision engineering projects. Miller also recorded Chamberlain's attitude problems, "John is difficult to work with. He is antagonistic toward others and must be pressured to face projects and complete."

Miller completed the evaluation form prior to his meeting with Chamberlain. However, he did not show the form to Chamberlain. It was Miller's personal policy not to show evaluation forms to employees. He did tell Chamberlain at their June meeting that he would not receive a wage increase that year because Miller felt essential functions of Chamberlain's department were not being achieved. Chamberlain had routinely received wage increases in prior years. He specifically mentioned the problems with the incentive system and problems of morale in the engineering department. He verbally discussed each part of the form with Chamberlain with the possible exception of his general remarks about Chamberlain's attitude.

Chamberlain understood following the meeting that Miller was dissatisfied with parts of his performance. Chamberlain, however, attributed most of this dissatisfaction to the fact that his department was short-handed. Miller's parting remark to Chamberlain was, "You have a lot of talent. We haven't decided what to do with you." Chamberlain claims to have taken this remark positively, referring to possible promotion. Certainly, the statement itself is ambiguous and is susceptible to the interpretation which Chamberlain claims to have given it. Nevertheless, Chamberlain's interpretation of the performance review was not reasonable in light of the events of the preceding several months, the denial of a wage increase, Miller's specific criticisms, and Burkholder's warning. The court finds that Chamberlain either knew or should have known that Miller was extremely dissatisfied with his job performance at the time of the June evaluation. However, Miller did not, at that time, or at any subsequent time prior to termination, advise Chamberlain that he was considering discharging him.

It is plausible, given Chamberlain's tenure of 23 years and his previously good record, that he did not recognize, without being specifically admonished by someone in authority, that termination was even possible, much less imminent. Indeed, it is incredible that Miller and Harry Bloem, Bissell's Executive Vice President and the person who ultimately approved Chamberlain's discharge, both of whom had known and worked with Chamberlain for all or most of his 23 years with the company, never discussed the possibility of termination with Chamberlain before the fact. The court concludes, however that this was the case. Chamberlain's actions after October, 1978 certainly reflected a belief that he was immune from termination or discipline, and it is possible that such an attitude could develop after 23 years of satisfactory service to one company. Neither Miller nor Bloem did anything to dissuade Chamberlain from this erroneous notion.

In the Spring of 1979 Miller received approval to hire an outside consultant to evaluate and recommend improvements to the manufacturing division. He hired the K. W. Tunnell Company to do this evaluation. The Tunnell report was issued in August, 1979.

As part of the overall evaluation the Tunnell Co. made evaluations of certain key incumbents within the engineering department. John Chamberlain was rated as average in most parts of his job and in overall job performance. It was specifically noted "Seems to lack initiative—seems 'burned out.'" The Tunnell company concluded that Chamberlain was limited to his present responsibilities and limited in long range potential.

Also as part of its report and recommendation Tunnell recommended a restructuring in the organization of the engineering department. At that time engineering was divided into two sections, Manufacturing Engineering, of which Chamberlain was the head, and Product and Process Engineering, of which John MacDonald was the head. Tunnel recommended establishing a new position which would have Chamberlain's job title, i.e. Manager-Manufacturing Engineering, but would have overall, supervisory responsibility for the entire engineering function. Chamberlain's position would become that of Chief Industrial Engineer and MacDonald's would become Chief Process Engineer.

The idea of combining the engineering functions under one head was not a new one. Chamberlain had previously been requested to familiarize himself with MacDonald's job in order to take it over when MacDonald retired. The request had first been made three years earlier when MacDonald was approaching age 62. Miller renewed that request in 1978 because MacDonald would be retiring in 1979 at age 65. One of Miller's criticisms of Chamberlain's performance was the lack of progress in Chamberlain familiarizing himself with MacDonald's job. However, the validity of this criticism is questionable given the fact that Chamberlain worked with MacDonald on almost a daily basis as a matter of

course, and had performed MacDonald's job on an interim basis at various times in the past. Chamberlain told Miller that he was reluctant to make overt intrusions into MacDonald's job functions while MacDonald was still on the job. Chamberlain had, in fact, expressed his disagreement with the company's previous attempt to force MacDonald to retire at age 62. Chamberlain's reluctance to intrude on MacDonald may have been the basis for Miller's judgment that Chamberlain was not carrying out his instructions with respect to taking over MacDonald's job.

In any event, Miller immediately adopted the Tunnell recommendation that the engineering department be consolidated under one manager. On August 30, 1979 he transmitted a memorandum to Harry Bloem incorporating this recommendation into his plan for the reorganization of the manufacturing division. He stated, with respect to the new position of Manager-Manufacturing Engineering, that "I have no candidates within the organization ...." He also stated, "Prior to the starting of Manager-Manufacturing Engineering, I plan to terminate John Chamberlain. A Chief Industrial Engineer would be hired sometime between 12–1–79 and 2–1–80." The clear import of this statement is that Chamberlain's replacement would be the Chief Industrial Engineer and this is consistent with the new organizational structure.

No reasons for Chamberlain's termination were given in the memorandum. Miller had previously discussed with Bloem the necessity of firing Chamberlain because of his "bad attitude." Bloem never discussed the termination with Chamberlain or suggested any alternative to Miller. Bloem's position was that the decision was Miller's to make. Bloem was and is holding Miller accountable for improvement.

The decision to create a combined manager for the entire engineering department created a dilemma for Miller in terms of Chamberlain's job assignment. As reflected in his memorandum, Miller had determined that Chamberlain was not qualified to handle the new, combined manage-

ment position. This determination was reasonable in light, not only of Miller's own observations, but of Sytsema's evaluations since 1974 pointing out Chamberlain's lack of creativity and leadership qualities, of the Tunnell report which evaluated Chamberlain's long range potential as "limited," and of the fact that Chamberlain had twice been passed over for promotion in favor of people without substantial manufacturing or engineering experience. Chamberlain's lack of qualification for a major management position had been the company's consistent judgment since at least 1974.

The alternative to promoting Chamberlain was to retain him in his present position with the new title of Chief Industrial Engineer. Having observed Chamberlain's "bad attitude," lack of cooperation, and bitter response to his failure to be promoted to Vice President, Miller reasonably concluded that the situation would only become worse if he hired someone new to become Chamberlain's boss. Such a move would have been an effective demotion for Chamberlain in terms of the organizational structure of the company and based on his response to Miller's ascension, Chamberlain would undoubtedly have been demonstratively resentful and uncooperative. Miller therefore decided to discharge him.

Chamberlain was terminated on September 7, 1979 at a meeting at which Chamberlain, Miller, and Wayne Klinkner, as Personnel Manager, were present. Chamberlain received his salary through the end of 1979 although September 7 was his last day of work. Miller told Chamberlain at the termination meeting that he was being terminated because of his poor attitude, lack of cooperation, and lack of leadership. His failure to take over MacDonald's job and failure to develop a new incentive system were also mentioned. Chamberlain had little or no reaction to the termination at this meeting and apparently did not ask for a more detailed explanation of the reasons for his termination at that time.

Klinkner was responsible for filling out the employment termination form required by company policy. On Chamberlain's form

he marked "Discharge" as the reason for termination as opposed to "Voluntary Quit," "Laid Off" or "Retirement." However, none of the subcategories of discharge, incompetence, insubordination, misconduct, or attendance, were marked. No detailed statement of the reason for discharge, as provided for by the form was completed. No employee's statement was taken. No one signed the form. This was all in violation of the company policy regarding termination as set forth in the Salaried Personnel Manual. The Personnel Department was not consulted prior to the termination which was also a violation of the termination policy.

Bissell had developed a written policy of terminating employees only for cause. Policy S–190 of the Salaried Personnel Manual (Plaintiff's Ex. 33N–1) classified terminations into five categories, voluntary quit, discharge, lay-off, military service, and retirement. On the termination form (Plaintiff's Ex. 33N–2), the "discharge" category is broken down into four subcategories; incompetence, insubordination, misconduct, and attendance. There is also a space for a detailed statement. In the case of all terminations the Personnel Department instructions were to complete the Employment Termination form as part of a termination interview with the employee. Only in the case of discharge is the employee's supervisor required to attend the interview. The only explanation for requiring the presence of the supervisor in the case of discharge is to explain the reasons for the discharge to the employee. The clear implication of this procedure, and the form, is that salaried employees will be discharged only for one of the four reasons listed on the form or for some other comparable reason which will be explained to the employee at the time of termination.

That this was in fact the company policy was verified by Bloem, Sytsema, and Miller. Sytsema testified that it was company policy to discharge only if someone was not doing their job, and also to give an employee notice and an opportunity to improve prior to discharge. Miller testified that Bissell hired people "with the understanding

that their employment at Bissell is dependent upon their performance . . . as long as they can accomplish those factors which are demanded of the company . . . we continued their employment . . . if through their own causes they have substandard performance . . . then we can deny that employment." This policy was incorporated into the salaried personnel manual and thereby disseminated to the salaried employees.

The termination policy does not require, either explicitly or by implication, notice to the employees prior to termination. It does not require that employees be given an opportunity to improve their performance prior to termination. Bissell has, however, adopted a written policy of annual performance review, part of the purpose of which, is to apprise salaried employees of supervisor satisfaction or dissatisfaction with their job performance.

Policy S–205, Plaintiff's Exs. 33 Q, R, S, and T comprises this review policy and provides detailed instructions as to how it will be carried out. The stated purpose of the performance review is to provide a means for "the employee and his supervisor to review his work performance, discuss job satisfactions and dissatisfactions, and set objectives for work accomplishment." The performance review is directly related to merit salary increases by terms of the policy.

The recommended procedure for completing the Performance Review Form is to discuss the parts of the form with the employee and to "attempt to reach agreement" regarding the employee's evaluation. The supervisor then fills out the form with the performance record "agreed upon." No specific provision is made for those cases in which agreement cannot be reached, but it is clearly the supervisor's function to complete the form. It can therefore be assumed that the form requires the supervisor's evaluation.

The form itself calls for a short written evaluation of each area of responsibility for the particular position involved. Separate sections are provided for recording improve-

ments or lack of improvements since the last review, and a record of "specific action" to be taken to improve performance. No objective standards for evaluating performance are provided or mandated. Nothing in the evaluations policy restricts the supervisor's discretion in setting performance standards.

Although the review policy does not contain specific requirements regarding review standards, the policy does create an expectation that employees will be comprehensively informed, each year, as to where they stand in their supervisors' estimation. Thus, an employee would reasonably expect that if his supervisor were considering termination for poor job performance at the time of the evaluation, he would be informed of that fact. From the employee's point of view, the possibility of termination would clearly be the most relevant information regarding his job performance and the need for rapid improvement.

Several factors lead this Court to the inescapable conclusion that Miller was considering Chamberlain's discharge at the time he conducted the performance review session in June, 1979:

First, Miller was clearly dissatisfied (and with ample justification) with Chamberlain's attitude, antagonism, and bitterness prior to June;

Second, the decision to terminate was finalized by August 30th;

Third, Miller was contemplating the consolidation of the engineering department prior to June;

Fourth, Miller's ambiguous remark to Chamberlain that "We haven't decided what to do with you" at the June performance review confrontation.

In retrospect, it is apparent that a decision to terminate was a likely course of action by June.

Beginning in March, 1974 the company also had a policy of mandatory retirement for executive employees at age 62. This policy is reflected in the Salaried Personnel Manual as S–180, Retirement Policy (Plaintiff's Ex 33C) and was officially in effect until May, 1975. This policy was initiated by Bloem as Executive Vice President and by Miller in his role as Vice President of Administration. The official policy was changed when the company was informed that the policy might violate state and national age discrimination laws. However, an informal policy of encouraging or coercing retirement at age 62 continued after the official policy was changed. Bloem personally encouraged executive retirement at age 62 and this policy may have affected the retirement decisions of Rex Burgdorfer, Ronald Prentice, and Charles Prys each of whom retired at age 62. Prys testified that he felt pressure to retire. John MacDonald was also pressured to retire at age 62 but was ultimately allowed to stay until age 65. During this three year period he was removed from the executive bonus plan and placed upon the management incentive plan, resulting in a decrease in compensation.

The early retirement policy did not affect Chamberlain's employment in any way. The reasons for the early retirement policy are not obvious although it may be assumed that it reflected either potential cost savings or certain presumptions about worker productivity after age 62. Bloem's testimony that it was for humanitarian and health reasons is inherently not credible. However, the differences between retirement at age 62 and termination at age 51, including the different cost factors involved, the independent reasons existing for Chamberlain's termination, the fact that Bloem and Miller were both over 51 but under 62, the eleven year difference in the ages, and the isolated nature of Chamberlain's termination, all deprive the early retirement policy of any inferential or circumstantial value relative to Chamberlain's termination.

Between 1970 and 1980 sixty-eight (68) persons held management or supervisory positions at Bissell. Twenty-eight people received promotions during this period. Seventeen of the promotions went to people over forty. Eight of those people were over 50. Most of the promotions of employees under age 40 were to non-executive foremen or persons in supervisory positions.

Only seven people were dismissed or demoted during the period ranging in age from 39 to 57. Four of these were over 50. Of eight listed vice presidents in 1980, four were over 50 and one was 49. Eleven people retired during the period, five were 65, three were 62, and three were under 60. Besides those already mentioned there were at least eleven other managers or supervisors working for Bissell in 1980 who were over 50. One was 63. Charles Huhm was hired as Advertising Manager in 1979 at the age of 55.

More specifically, in the manufacturing division Dale Miller was promoted to vice president at age 54. Miller promoted Don DeMaagd, at age 52, to Chief Process Engineer, replacing MacDonald. Charles Prys, who may have been victimized by the early retirement policy, was promoted to Plant Engineer at the age of 54. Miller appointed Clayton Burkholder as Plant Supervisor at the age of 59.

In December, 1979 Miller hired James Burggraaf, age 32, to become Manager of Manufacturing Engineering. Although Burggraaf was technically hired into the new position as head of the combined engineering department, his job description and job duties are virtually identical to those of John Chamberlain prior to his termination. Bissell has never hired a replacement for Chamberlain as Chief Industrial Engineer; therefore, since his hiring, Burggraaf has operated as Chamberlain's effective replacement. In 1981 Bissell hired an additional industrial engineer giving Burggraaf a staff of three engineers compared to Chamberlain's staff of two engineers. After his discharge, Chamberlain became severely depressed and suffered a weight loss of approximately 35 pounds. He did not find adequate new employment until the middle of 1981. This also contributed to his depression. His mental and emotional condition have improved somewhat since finding new employment.

## CONCLUSIONS OF LAW

### Age Discrimination

The Sixth Circuit has recently concluded that it would be inadvisable to mechanically apply the Title VII standards enunciated in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) to cases brought under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 et seq. In *Ackerman v. Diamond Shamrock Corp.,* 670 F.2d 66 (6th Cir. 1982) the court pointed out that such mechanical applications might deny some worthy age discrimination claims and permit some unworthy claims.

The ultimate issue is whether age was a factor in a decision of an employer to terminate an ADEA claimant and whether the age of claimant made a difference in determining whether he was to be retained or discharged.

*Ackerman, supra.* See also *Tuohy v. Ford Motor Co.,* 675 F.2d 842, 6th Cir. 1982. The difficulty of traveling through the steps suggested by *McDonnell Douglas* is evident in this case in which the plaintiff's case-in-chief included the testimony of several company officials who articulated the non-discriminatory reasons for plaintiff's discharge. Therefore, in accordance with *Ackerman,* (see also *Sahadi v. Reynolds Chemical,* 636 F.2d 1116 (6th Cir. 1980)), the court considers whether plaintiff has met his ultimate burden of proving that his age made a difference in the decision to terminate his employment.

The court has concluded, as part of its findings of fact, that Chamberlain was terminated because (1) Miller was dissatisfied with his performance and attitude since Miller had become Vice President of Manufacturing; (2) Miller wanted to consolidate the engineering department under one manager, and he did not believe that Chamberlain was qualified for that position; and (3) Miller did not believe that Chamberlain would cooperate with a new manager acting as his supervisor. Obviously this finding precludes a finding of age discrimination. Each of the three factors relied on by Miller in firing Chamberlain were reasonable and supported by the objective facts available to Miller at the time. These facts

include Chamberlain's actions since Miller had become vice president, in disrupting meetings and refusing to cooperate in cost estimation and incentive systems changes, and Chamberlain's consistent evaluation since 1974 as lacking in creativity and leadership capabilities. His decision was further buttressed by the Tunnell reports' independent evaluation of Chamberlain as lacking initiative and having limited potential for advancement.

The plaintiff has failed to provide any direct or circumstantial evidence of age discrimination against him. Although Bissell apparently had both a formal and informal policy of early retirement at age 62 the plaintiff has failed to connect that policy to his own termination. While an inference of discrimination in an individual case may be drawn from proof of a policy or practice of discrimination in other cases, there must be some logical connection between the policy or practice and the facts alleged in the individual case in order for that inference to arise. No such logical connection appeared in this case.

On the contrary, the undisputed evidence submitted by the defendant reveals that as of 1980 approximately one-third of Bissell's management and supervisory staff were over fifty years of age. Such a situation could not occur if Bissell had a practice of discharging or otherwise terminating executive employees when they reached 50 or 51 years of age. The plaintiff has the burden of proving that age was a factor in *his* termination, not merely that age has been a factor in some actions taken by the company against other employees who were eleven years older than the plaintiff.

That a plaintiff must offer some *evidence* of age discrimination beyond his mere conclusion that no reason other than age existed for his discharge was emphasized by the Sixth Circuit in *Locke v. Commercial Union Ins. Co.,* 676 F.2d 205, 1982 in which the Court approved the granting of summary judgment in favor of the employer. There is no "automatic presumption" that the termination of an employee within the protected category (age 40 to 70) violates the ADEA. *Locke, supra.*

The plaintiff has advanced a novel theory, based on one sentence in *Laugesen v. Anaconda Co.,* 510 F.2d 307 (6th Cir. 1975), to argue that age discrimination is present in this case. The plaintiff presented some far-fetched and unsupported testimony by one of his expert witnesses that Miller was motivated to fire Chamberlain because of his fear of Chamberlain's power base within the company. The plaintiff argues that a power base can only arise through length of service, and since length of service is "inevitably related to age," *Laugesen, supra,* at 313, therefore termination because of "power base" is the equivalent of age discrimination.

Given the fact that Chamberlain had twice been passed over for vice president, one has to question to what extent Miller feared Chamberlain's "power base." Based upon the evidence in this case Miller had more to fear from the top if *he* didn't produce. Nevertheless, even if Miller *had* fired Chamberlain because of jealousy over "power base," that would not amount to a case of age discrimination. Power base is not age, and terminations resulting from organizational competitiveness or jealousy are not prohibited by the ADEA. Management may legitimately discharge an executive employee because he or she has "burned out," i.e. become complacent and lost creativity and initiative, *Laugesen, supra,* at 313, even though the "burn out" may be directly caused by the employee's age and length of service. The same principle applies to corporate power base created by length of service. Furthermore, an employee may be fired because of a "personality conflict" with his or her supervisor without violating the ADEA even though the employee is within the protected age group. *Ackerman v. Diamond Shamrock, supra,* at 70.

The plaintiff has also pointed to the fact that two younger employees, in the engineering department, Gibbs and Beukema, who were 49 and 46 years of age respectively, were retained despite having lower evaluations than Chamberlain in the

Tunnell report. At the outset it should be observed that differences between the evaluations of these three employees as well as the differences in their ages, were very marginal. All three were rated "average" overall. However, one important factor which prevents any inference being drawn from Gibbs' and Beukema's retention is the fact that they were not, unlike Chamberlain, management personnel. Bissell acts well within its legitimate prerogative in requiring higher performance standards for management personnel and the fact that it will tolerate marginal performance in non-management positions does not create a duty to tolerate such performance among its executives. *Ackerman v. Diamond Shamrock, supra,* at 70, citing *Loeb v. Textron, Inc.,* 600 F.2d 1003 (1st Cir. 1979). Further, it was Chamberlain's insolence and lack of cooperation that were root causes of his poor performance.

The plaintiff also points to the fact that a much younger employee, James Burggraaf, age 32, was hired to replace Chamberlain. Certainly this fact could be evidence of age discrimination. However, replacement by a younger employee does not prove age discrimination or even create the strong presumption of discrimination which might arise in a race or sex discrimination case in which a protected employee is replaced by someone outside the protected category. The reason for this was explained in *Laugesen v. Anaconda Co.,* 510 F.2d at 313, fn. 4:

> The progression of age is a universal human process. In the very nature of the problem, it is apparent that in the usual case, absent any discriminatory intent, discharged employees will more often than not be replaced by those younger than they, for older employees are constantly moving out of the labor market, while younger ones move in. This factor of progression and replacement is not necessarily involved in cases involving the immutable characteristics of race, sex and national origin.

The Court might have added that the universal nature of the "progression of age" also diminishes the motivation to discriminate which courts often assume to exist in race and sex discrimination cases. A male never (or seldom) becomes a female, a white person never becomes a black person, but everyone ages and either dies or becomes old. In this case the person who fired Chamberlain was actually older than Chamberlain. He also hired a 52 year old individual to become Chief Process Engineer, a position equivalent to Chamberlain's. Thus, the fact that a younger individual was hired to replace Chamberlain does not raise an inference of age discrimination.

*Toussaint Claim*

■ In Michigan the Supreme Court has held that an employee may obtain enforceable contractual rights through the policy statements of an employer. *Toussaint v. Blue Cross & Blue Shield* of Michigan, 408 Mich. 578, 292 N.W.2d 880 (1980). This court has concluded that Bissell had adopted and promulgated a policy of terminations for good cause only. The reasons for discharge were listed on the termination form as incompetence, insubordination, misconduct, and attendance, and definite termination procedures had been adopted to provide employees with the reasons for their discharges. Although not specifically limited to the reasons for discharge listed on the form, the procedure as a whole implied a policy of discharge only for good cause, i.e. those reasons listed on the form or some other equivalent and equally good reason. See *Schwartz v. Michigan Sugar Co.,* 106 Mich.App. 471, 308 N.W.2d 459 (1981). This policy was understood to exist by Chamberlain, Miller, Bloem, and Sytsema. The testimony of Klinkner to the contrary is not credible.

The company had *not,* however, adopted a policy of requiring notice to employees *prior* to the termination coupled with a probationary period in which the employee has an opportunity to save his job by improving his performance. Although William Sytsema testified that such opportunity to improve was a part of company policy, his testimony was premised primarily in terms of his own expectations. The termi-

nation policy published in the Salaried Personnel Manual, was detailed but contained no reference to such prior notice. As a matter of company policy the only notice of inadequate performance required to be provided to employees was their annual performance review.

Given an enforceable policy of termination for good cause only, the court is confronted with the necessity of determining whether Chamberlain was terminated for good cause:

> Where the employee has secured a promise not to be discharged except for cause, he has contracted for more than the employer's promise to act in good faith or not to be unreasonable. . . .

> In addition to deciding questions of fact and determining the employer's true motive for discharge, the jury should, where such a promise was made, decide whether the reason for discharge amounts to good cause; is it the kind of thing that justifies terminating the employment relationship? Does it demonstrate that the employee was no longer doing the job?

*Toussaint, supra,* 292 N.W.2d at 896.

The cases decided since *Toussaint* have supplied little guidance as to what constitutes "good cause." *Toussaint* itself implies that this may also depend on the particular employment relationship, i.e. the policies and custom of the employer regarding terminations. The court stated:

> An employer who agrees to discharge only for cause need not lower its standard of performance. It has promised employment only so long as the employee does the job required by the employment contract. *The employer's standard of job performance can be made part of the contract.* Emphasis added.

*Toussaint, supra,* 292 N.W.2d at 897.

One would assume that since the promise not to discharge except for good cause can be established through policy statement and custom, the requisite standard of performance can be established, i.e. "made part of the contract," by the same method. Thus, if an employer has a policy of firing employees for a particular reason, that reason has been defined by the employment "contract" as good cause for discharge.

There have been so few discharges among management personnel at Bissell, at least in the last ten years, that it is unlikely that any clear "good cause" policy has been adopted. Furthermore, no evidence was offered as to the reasons for prior discharges.

In this case Chamberlain was fired as the result of a conjunction of circumstances. Miller was honestly and justifiably dissatisfied with his performance. He also anticipated Chamberlain's negative reaction to the hiring of a new manufacturing engineering manager and anticipated that Chamberlain would not cooperate with the new manager. Whether Chamberlain would have been fired if Bissell had not chosen to reorganize the engineering department is difficult to say. The court can only say that both Chamberlain's current performance and Miller's anticipation of Chamberlain's reaction to the new manager played a role in the decision to terminate him. If either of these reasons, or both taken together, constitute "good cause" then Chamberlain's employment contract has not been breached by his discharge.

The court concludes that good cause existed for Chamberlain's discharge. Since Miller's appointment as Vice President of Manufacturing, Chamberlain had refused to cooperate in making cost estimates and reviewing incentive rates. As a result Miller had had to screen all cost estimate requests because he could not trust Chamberlain to decide which estimates should be quoted and which should not. Also, Wayne Klinkner had to take the unusual step of having several meetings with the entire production line regarding incentive rates, an obviously disruptive procedure.

Chamberlain had also disrupted the functioning of the Product Committee. He had been highly critical of higher level management in an antagonistic manner in front of other employees. Clayton Burkholder had warned him that he might be discharged for his arrogant and critical attitude, indi-

cating that the problem was of obvious severity. Chamberlain's bitter and disruptive activities had gone on for at least ten months prior to his discharge.

In addition, Miller's anticipation of further problems if he hired someone over Chamberlain as the new manager of Manufacturing Engineering was not merely conjecture, it was a highly probable and realistic assessment of Chamberlain's reaction to his failure to be named vice president. Nothing in the letter nor in the philosophy of *Toussaint* prevents an employer from basing employment decisions upon the anticipated future conduct of employees as a result of their past conduct. Indeed, anytime an employee is discharged for some past conduct, the discharge is based in part upon the anticipation that such conduct will be repeated in the future. If an employer is not entitled to make such predictions there would never be "good cause" for a discharge. *Toussaint* does not go that far.

The court must conclude that the overwhelming evidence compels a finding that Chamberlain was terminated pursuant to just cause as required by the termination policy adopted by Bissell. Since the company had not adopted a policy of prior notice, the failure to notify Chamberlain prior to

his termination does not rise to the level of a breach of contract. *Toussaint* itself imposes no duties on employers, it merely holds that employers may impose duties on themselves through the adoption and dissemination of employment policies. Bissell's contractual duties extend no further than the policies it has adopted.

*Negligence*

The plaintiff has also raised a claim of negligence in the evaluation and discharge of Chamberlain without giving him prior notice of the intent to discharge him.[1]

The elements of a cause of action for negligence in Michigan are well defined. They include:

(1) The existence of a legal duty by defendant toward plaintiff;

(2) The breach of such duty;

(3) A proximate causal relationship between the breach of such duty and an injury to the plaintiff;

(4) Damages suffered by the plaintiff as a result of such injury.

*Connelly v. Paul Ruddy's Equipment Repair & Service Co.*, 388 Mich. 146, 200 N.W.2d 70 (1972). Therefore, in considering the plaintiff's claim of negligent evaluation, the court must first determine whether the de-

1. The court recognizes that the original negligence count focused upon the claims of age discrimination; however, the plaintiff's pre-trial brief stated at page 16, "additional evidence of negligence will include expert opinion testimony that defendant did not conform with either its own personnel policies or with industry practice in appraising John Chamberlain's work performance and in the discharge." Therefore, the defendant was aware prior to trial that it faced a general claim of negligence in Chamberlain's discharge. Moreover, the propriety of the failure to provide Chamberlain with notice was in issue from the outset of the trial and was the focus of much testimony, including expert testimony concerning industry practice regarding prior notice of discharge. Such testimony was obviously irrelevant to the contract claim. Therefore, the defendant was on notice that the issue of negligence in failing to give prior notice to Chamberlain was being tried. Defendant's counsel recognized this aspect of the negligence claim in his closing argument and argued it on the merits.

Federal Rule of Civil Procedure 15(b) allows the court to hear and decide issues which have

not been technically pleaded when neither party is prejudiced thereby. The Rule permits such amendments even if it involves changes or expansions in the cause of action, such as adding additional acts of negligence. *See* 3 Moore's Federal Practice ¶ 15.13[2], at 15–157 to –179 (2d ed. 1982). Frequent application of the Rule occurs in cases in which one theory of negligence is pleaded, but subsequent to the taking of proofs recovery is granted on a different theory of negligence. *See id.* at 15–173 to –174.

"The test should be whether the defendant would be prejudiced by the implied amendment, *i.e.,* whether he had a fair opportunity to defend and whether he could offer any additional evidence if the case were to be retired on a different theory." *Id.* at 15–172 to –173 (footnote omitted). Since the negligence of Bissell in failing to provide notice to Chamberlain of his impending discharge was tried by the parties, and can be decided on the facts which were contested by the parties, this claim may be properly considered and decided under Rule 15(b).

fendant had any legal duty of care with respect to the performance of plaintiff's job evaluation. The question of duty is a legal question which turns primarily on the relationship between the parties. *Smith v. Allendale Mutual Insurance Co.*, 410 Mich. 685, 303 N.W.2d 702 (1981).

In this case, the defendant and the plaintiff stood in the relationship of employer and employee, and the employer, Bissell, had undertaken to perform certain contractual obligations for the benefit of the plaintiff. Among these contractual obligations were (1) to discharge the plaintiff only for just cause; and (2) to conduct annual performance reviews. The court has found that the annual performance reviews were intended, at least, in part, to benefit Bissell's employees, such as the plaintiff, by informing them of how their supervisor viewed their performance.

There is a well settled principal in Michigan, as well as other jurisdictions, that a duty of ordinary care arises from the *performance* of a contractual obligation. *Hart v. Ludwig,* 347 Mich. 559, 79 N.W.2d 895 (1956); *Clark v. Dalman,* 379 Mich. 251, 150 N.W.2d 755 (1967); *Hanft v. Southern Bell Tel. & Tel. Co.,* Fla.App., 402 So.2d 453 (1981); *Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980). Thus, while a complete failure to perform a contractual obligation may be actionable only as a breach of contract, the negligent *performance* of the obligation is actionable as a tort. The fact that no actionable breach of contract may have occurred does not preclude a finding that the performance of a contractual undertaking has been negligent and resulted in harm to the other contracting party or to a third person. The duty of ordinary care is distinct from the duty to perform, as explained in *Hart v. Ludwig* :

"The action of tort has for its foundation the negligence of the defendant, and this means more than a mere breach of a promise. . . .

"As a general rule, there must be some active negligence or misfeasance to support tort. *There must be some breach of duty distinct from breach of contract.*

[emphasis supplied] *Hart v. Ludwig, supra,* at 563, 79 N.W.2d 895, quoting from *Tuttle v. Gilbert Manu. Co.,* 145 Mass. 169, 13 N.E. 465.

Since Bissell had a contractual obligation to conduct performance reviews, and since it actually undertook to conduct these reviews, it follows that Bissell had a duty to use ordinary or reasonable care in performing the plaintiff's reviews. The plaintiff has, therefore, properly stated a cause of action by alleging that Bissell was negligent in conducting his June, 1979 evaluation. A cause of action for negligent job evaluation has already been recognized in the Michigan courts in the wake of the *Toussaint* opinion. See *Schipani v. Ford Motor Co.,* 102 Mich.App. 606, 302 N.W.2d 307 (1981).

Having determined that a duty of ordinary or reasonable care existed with respect to the performance of the June evaluation, the court considers (1) what specific standard of care existed in this case, i.e. how a reasonable person would have acted with respect to the June evaluation, and (2) whether Miller conformed to that specific standard in conducting that evaluation. See *Moning v. Alfono,* 400 Mich. 425, 254 N.W.2d 759 (1977).

Several factors lead the court to the conclusion that a reasonable person, under the circumstances of this case, would have told Chamberlain that discharge was being considered, or was possible, without a rapid and drastic change in his job performance, at the time of the June evaluation. Since Miller failed to give Chamberlain this warning, the court concludes that he was negligent in this case. The factors which the court considers most critical in reaching this conclusion include the following:

1. Miller knew, or should have known, that Chamberlain would expect to be given notice of an impending discharge, at least if the discharge was being considered at the time of his annual evaluation.

The evaluation and just cause policies themselves tended to create an expectation

among employees that they would be given notice and an opportunity to improve prior to discharge. William Sytsema, Chamberlain's prior supervisor, shared this expectation and, in fact, considered it a part of company policy. At the very least, an employee such as Chamberlain would expect to be told *at his evaluation* if discharge was being considered. No other information could be as relevant and meaningful in apprising an employee of his current job status.

It might be argued that Miller did not wish to make a bad situation worse by informing Chamberlain that he might be fired. Such an argument would be plausible if Miller was still hoping that the mere passage of time would solve Chamberlain's attitude problem. However, in light of the fact that Chamberlain was fired two months after the evaluation, the argument lacks credibility. Clearly, time was already running out at the time of the June evaluation and Miller had no intention of giving Chamberlain significantly more time or motivation to adjust.

2. Miller knew, or should have known, that Chamberlain's 22 years of adequate service tended to create a heightened sense of job security on his part, which Miller knew to be unjustified.

The duty of reasonable care is not static but depends on the facts and circumstances of each individual case. (See discussion of general and specific standard of care in *Moning v. Alfono, supra.*) Thus, what might be reasonable or ordinary conduct toward a probationary or short-term employee, might be careless and unreasonable with respect to a long-term employee. An employee's length of service has been held to be a significant consideration in deciding whether an employer has conformed to a standard of "good faith and fair dealing." See *Pugh v. See's Candies, Inc.,* 116 Cal. App.3d 330, 171 Cal.Rptr. 917 (1981) (32 years of service) and *Cleary v. American Airlines, Inc.,* 111 Cal.App.3d 456, 168 Cal.

Rptr. 722 (1980) (18 years of service). See also *Cancellier v. Federated Department Stores,* 672 F.2d 1312, 28 FEP Cases 1151 (9th Cir. 1982). Length of service has the same relevance to the question of whether an employer has acted with reasonable care in evaluating and discharging an employee, both because the long-term employee has, in a sense, "earned" a greater degree of care from his employer, and, secondly, because the length of service naturally creates an obstacle to the employee fully appreciating the possibility of discharge in his own case.[2]

3. Miller knew, or should have known, that Chamberlain's previous evaluations had been relatively adequate, if not good, that Chamberlain had had no previous reason to fear for his job, and that Chamberlain's decline in performance was directly related to his failure to be named a vice president.

The cause of Chamberlain's precipitous decline in performance was clearly identified, and was admittedly recognized by Miller. This was not a case in which Chamberlain's performance had experienced a steady decline, with his evaluations becoming worse and worse, leading to the inevitable and foreseeable discharge. The drastic decline in his performance in 1979 indicated that a drastic improvement was at least theoretically possible given the right incentive. The threat of discharge would have obviously been a strong incentive for improvement.

Additionally, the fact that Chamberlain's previous evaluations had been adequate to good would tend, like his length of service to lull him into a false sense of security. The most obvious, and as a last resort, the only way to dispel that false sense of security was to apprise Chamberlain of the fact that discharge was imminent.

4. Miller's failure to specifically inform Chamberlain of the possibility of discharge served no identifiable employer

2. The court does not hold that a particular length of service always and necessarily creates a duty to give prior notice of discharge. Each case is decided on its own facts. The court merely considers length of service to be a relevant factor in deciding whether the failure to give notice was careless or negligent in a particular case.

interest which would justify the risk it imposed upon Chamberlain.

In deciding whether conduct was reasonable or unreasonable, the risk created by the conduct must be balanced against the value or benefit of the conduct. See *Moning v. Alfono, supra.* As previously discussed, the situation in this case had so deteriorated by June that Miller's failure to inform Chamberlain of the possibility of discharge, cannot be explained as a managerial tactic, or as deference to Chamberlain's feelings. All it accomplished was to leave Chamberlain in the dark to a greater extent than necessary.

Miller did not provide any justification for the failure to fully inform Chamberlain of his situation. He testified that he believed Chamberlain knew, or that Chamberlain should have known, that he was running a risk of being discharged. This was undoubtedly true, as the court has indicated in its findings of fact and more fully discusses later in this opinion; however, such a justification ignores the other factors which Miller knew to exist and which could have clouded Chamberlain's judgment and perception. The fact is that Miller was in a position to *eliminate all doubt* concerning Chamberlain's status, and, further, to provide Chamberlain with the *greatest possible incentive* to reform his conduct and improve his performance. There was no reason for Miller *not* to take the necessary step of informing Chamberlain, and his failure to do so may properly be labeled as negligent in the circumstances of this case.

It is unavailing for Bissell to argue that it had no duty to provide notice, to hold Chamberlain's hand, or to tell him what should have been obvious. Bissell had a duty of reasonable care. By failing to fully inform Chamberlain it increased the risk that he would ultimately be discharged. Bissell's failure is not justified by any counterbalancing benefit or interest. Therefore, Bissell breached its duty of reasonable care.

The court concludes that Bissell's negligence was both a cause in fact and a proximate cause of Chamberlain's discharge. Given the fact that Miller by his own ad-

mission had not made up his mind to discharge Chamberlain at the time of the June evaluation the court cannot say that Chamberlain could not or would not have saved his job had he been fully informed of his situation. Likewise, the contractual duty to conduct performance evaluations, and the natural reliance on those evaluations by employees, make damage flowing from the negligence in this case sufficiently foreseeable to satisfy the proximate cause requirement. See *Moning v. Alfono, supra.*

*Contributory Negligence*

Although contributory negligence was not pleaded, it was tried to the same extent as plaintiff's "revised" negligence claim and may therefore be considered by the court under Rule 15.

Michigan has recently adopted a "pure" form of comparative negligence in which the contributory negligence of the plaintiff does not act as a complete bar to his recovery, but serves to diminish his recovery in proportion to the amount of his negligence. *Placek v. City of Sterling Heights,* 405 Mich. 638, 275 N.W.2d 511 (1979). Therefore, the court must determine the extent to which Chamberlain was responsible for his own discharge.

That Chamberlain's conduct was negligent and was largely responsible for his discharge cannot be doubted. He was negligent in a variety of ways:

1. He allowed his disappointment over his failure to be promoted to seriously affect his job performance.

2. He performed his job functions totally inadequately, and exhibited a hostile attitude toward higher management, during the last ten months of his employment.

3. He failed to heed a number of warnings which he did have that his job could be in jeopardy. These warnings included:

   a. Clayton Burkholder's specific warning;

   b. Miller's statement after the disrupted Product Committee meeting;

   c. The denial of a salary increase;

d. Miller's parting comment at his June performance evaluation interview.

4. Despite the warnings which he had and an obviously deteriorating situation, he failed to make specific inquiry of Miller, either before, during, or after his job evaluation, regarding his status.

It is clear, therefore, not only that Chamberlain's attitude, conduct, and job performance created the situation which led to his discharge, but that Chamberlain played a role in leaving himself uninformed concerning his status. As a result, the court concludes that Chamberlain's contributory negligence was 83% responsible for bringing about his own discharge and the damages resulting therefrom. Under *Placek,* therefore, Chamberlain will recover 17% of his actual damages.

## DAMAGES

The parties have submitted Exhibit 45A by stipulation which contains various calculations of lost wages and pension benefits based on certain assumptions. Lost wages and benefits were calculated with and without a 6% "inflation factor" reflecting a projected increase in salary of 6% per year. This was the average increase Chamberlain had experienced over his 23 years with Bissell. The defendant does not agree that the use of this factor is proper. The court concludes that an assumption of a 6% annual wage increase is reasonable given Chamberlain's wage history. The assumed increase should therefore be included in calculating past and future lost wages, and lost pension benefits. Lost future wages were calculated using the assumption that both Chamberlain's Bissell salary, and his salary in his current employment, would increase by 6% per year. The parties have stipulated that pension benefits in Ex. 45A were calculated incorrectly and that all pension figures should be reduced by 20%. The court has assumed that Chamberlain would have worked to age 70 since no evidence was presented that he would have retired earlier than required by Bissell policy.

Based on these assumptions and findings, Exhibit 45A reveals the following calculations:

| | |
|---|---|
| Lost past wages | $ 48,732.00 |
| Lost future wages | 153,565.00 |
| Lost pension benefits (reduced by 20%) | 8,609.00 |
| Total | $210,906.00 |

The court assesses damages for Chamberlain's mental distress since his termination at $75,000 the first year, $50,000 for the second year, and $25,000 for the third year. This reflects the fact that Chamberlain's severe depression was most acute immediately after his termination and improved after finding and adjusting to adequate new employment. Chamberlain's damages resulting from his discharge therefore total $360,906.

The court found no evidence of maliciousness, wilfulness or recklessness so as to justify the award of punitive damages. The most that Miller exhibited was a failure to recognize the need for, or the utility of, a warning, or reluctance to confront Chamberlain prior to termination. Therefore, no punitive damages will be assessed. Such damages would be particularly unwarranted considering Chamberlain's high degree of contributory negligence.

Chamberlain will recover 17% of his actual damages or $61,354.02, plus interest in accordance with Michigan statutory authority. M.S.A. § 27A.6013 [M.C.L.A. § 600.-6013] provides for interest at 12% per year from the date of filing the complaint until the date of satisfaction of the judgment.