**Georgia A. KNIGHT, Administratrix of the Estate of James T. Knight, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 78–10047.

United States District Court, E. D. Michigan, N. D.

July 3, 1980.

Donald E. Shely, David J. Adams, Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., Robert A. Burns, Korn, Burns, Hogg & Fershee, Cadillac, Mich., for plaintiff.

Mark A. Dombroff, Asst. Director of Torts, Civ. Div., U. S. Dept. of Justice, Washington, D. C., Gary W. Allen, Chief, Accident Counsel Branch, Federal Aviation Administration, Washington, D. C., Wallace C. Magathan, III, Federal Aviation Administration, Washington, D. C., for defendant.

## MEMORANDUM OPINION AND ORDER

JAMES HARVEY, District Judge.

Pursuant to this Court's Order of Reference filed on November 13, 1979, this matter came on for trial before the Honorable Harvey D. Walker, United States Magistrate. On June 9, 1980, the U.S. Magistrate filed his recommendation that this Court issue an Order that judgment be entered in favor of the defendant United States of America.

There being no objections to the recommendation of the U.S. Magistrate as of this date, and the Court having reviewed the matter and otherwise being fully advised, the recommendation of the U.S. Magistrate filed June 9, 1980 is ADOPTED in full as the Opinion of this Court.

Accordingly, IT IS HEREBY ORDERED that judgment be entered for defendant United States of America.

IT IS SO ORDERED.

## MEMORANDUM OPINION AND RECOMMENDATION

June 9, 1980.

HARVEY D. WALKER, United States Magistrate.

United States District Judge James Harvey, by order dated November 13, 1979, designated United States Magistrate Harvey D. Walker as Special Master to conduct a non-jury trial of this matter, and to make a report and recommendation thereupon. Pursuant to that order trial was held commencing February 5, 1980, and the following report is made thereof.

## FINDINGS OF FACT

1. At approximately 8:55 a. m. EDT May 6, 1975, Plaintiff's decedent James T. Knight departed Grayling Airport, Michigan, in a 1967 Cessna 150G. His destination was Flint, Michigan. Approximately 9:10 a. m., while piloting the aircraft at an altitude of 360 feet above ground level (AGL), he flew into one of several guy wires supporting a radio transmitter tower and crashed. Mr. Knight, who died in the crash, was the sole occupant of the aircraft.

2. Mr. Knight was self–employed as the only pilot for Pegasus Flying Service, an unincorporated air charter service owned by him. He held a commercial pilot license with instrument and multi–engine ratings, and was an experienced pilot with in excess of 8,500 hours of flying time.

3. Mr. Knight travelled between his home in Grayling to his place of work in

Flint, by aircraft and by car on weekends, for about four years prior to the crash. He knew the route by air well enough to fly back and forth between Flint and Grayling without reference to an aeronautical chart. He demonstrated his ability to fly significant portions of the route at 150–250 feet AGL without reference to a chart. Mr. Knight was aware of the hazards of flying at such low altitudes, and cautioned Mr. Ted Harwood, a passenger on two such flights who testified in this proceeding, against flying in such a manner himself.

4. Knight had flown home to Grayling for the weekend of May 3–4, 1975, and remained there through Monday to attend a meeting relating to the Grayling airport. The purpose of Mr. Knight's trip the Tuesday morning of May 6, 1975, was, in part, to return to work. Probably a more urgent purpose was to attend a meeting in Flint that day with Congressman Riegle. Mr. Knight operated a Beech–18 or Twin Beech, which he used in his air charter service, and the FAA had announced a proposed order permanently grounding all Beech–18's, which would have substantially damaged his business. He and other affected operators hoped to gain the assistance of Congressman Riegle to block the order.

5. The radio tower involved was owned by the Sparks Broadcasting Company of Houghton Lake, Michigan, and was located between Grayling and Saginaw at a point 8 miles east of Prudenville, Michigan, and about one mile from Interstate 75. The tower was 500 feet in height, and at least two of its beacon lights were operating at the time of the crash. It was a new tower. Construction had begun on February 3, 1975, and it was completed on April 1, 1975. The location of the tower was not marked on either the 1975 Michigan State Aeronautical chart nor the 8th Edition of the Lake Huron Sectional Aeronautical Chart, both of which were published before the tower was constructed and were in effect at the time of the crash. The Federal Aviation Administration did not disseminate a Notice to Airmen (NOTAM) or Airman Advisory (AIRAD) pertaining to the tower either before or after the crash.

6. The aircraft in question was fully equipped and certified for flight under instrument flight rules (IFR). All such equipment was in proper operating condition at the time of the crash. There was no evidence of any pre–impact malfunction in the aircraft's engine, flight controls, or other systems.

7. Mr. William Moore, the NTSB investigator of the crash, contacted every facility in Michigan and found no record of any contact between James Knight and any of the Flight Service Stations on May 6, 1975. There was conflicting testimony as to the reliability of the procedures employed at Flight Service Stations for making a log of all pilot contacts. Although it appears that Flight Service Station attendants are required to accurately maintain such records, one witness testified that, based upon his observations of the operations of Flight Service Stations, contacts with pilots were frequently made and not recorded. Certainly a presumption entitled to some weight must arise from the absence of any record of contact between James Knight and Flight Service. However, the exact weight to which such a presumption is entitled is not clear from the facts. Some effort was made by Plaintiff to rebut this presumption through her testimony that James Knight stated before taking off on the final flight that he would contact Flight Service by radio, once he was airborne. In light of this conflicting evidence the Special Master is unable to make a finding as to whether James Knight actually did contact Flight Service. Nevertheless, the Special Master finds that resolution of this issue is not necessary to the determination of the outcome of this case, since there is strong evidence that James Knight displayed a high degree of negligence in this case by other actions and inactions on his part. On the other hand, if the FAA had a duty to know and disclose the existence of the Sparks Tower, that duty would exist with respect to James Knight unless it was established that none of the reasonable means for making this disclosure would have been effective to alert James Knight to the dan-

ger. While James Knight may have failed on this one occasion to contact a Flight Service Station, the evidence does establish that James Knight generally did contact Flight Service Stations, and did consult AIRAD and NOTAM sources. Certainly if the FAA had used these channels to disseminate the information at a reasonable time, James Knight would have been apprised of it at some time prior to the crash.

8. While en route, Knight flew into deteriorating weather in ceilings as low as 200 feet and visibilities of one–half mile or less. At the tower, the ceiling was approximately 250 feet, with the clouds obscuring roughly one–half of the tower as viewed from the ground. The eyewitness to the crash, Mr. Fred Huff, testified by deposition that he was standing outside his mobile home near the tower when he saw Knight's aircraft flying low overhead. Knight was looking at Huff out his left window and down as Huff watched him fly into the lowering overcast. The clouds obscured Huff's view of Knight's impact with the guy wire. Mr. George Rhodes, Plaintiff's pilot expert, testified that while in clouds, the pilot's forward visibility would be zero.

9. Based upon all of the evidence, the circumstances under which James Knight undertook the fatal flight at its inception were not clearly suitable for VFR flight. In fact, Plaintiff described the weather conditions at Knight's departure as the worst she had ever seen him take off in, in the Cessna. It seems apparent that those conditions deteriorated considerably somewhere between the airport and the crash site. AIRMET Echo 2, a pilot's weather advisory disseminated to all pilots through Flight Services, indicated that conditions could be expected at certain points along the route from Grayling to Flint, under which VFR flight would be in violation of the FAA Regulations. One mile visibility is required for VFR flight. 14 CFR § 91.105. The AIRMET Echo 2 on May 6, 1975, warned of visibilities varying to as low as one–half mile over Flint and over Saginaw, and also of ceilings varying as low as 200 feet in the vicinity of Saginaw. The ceiling in the vicinity of the tower was approximately 250 feet. The most favorable ceiling reported by certified weather observers in the vicinity of James Knight's route was 600 feet at Houghton Lake. The record establishes that James Knight flew at 360 feet immediately adjacent to the tower guy wire, and shortly before that at between 50 and 200 feet near I–75, where he was observed by Robert Evans, a certified FAA weather observer. The most probable inference is that this very low flight was necessitated by low ceilings. It may be (the Special Master deems the evidence insufficient to support a finding on this point) that much of the area along James Knight's route was sparsely populated, so as not to be subject to any minimum altitude requirement by the FAR's. Nevertheless the uncontroverted testimony of the pilot–expert witnesses for both parties established that a reasonably prudent pilot would not attempt to fly significant distances under a 200 foot ceiling, even where this was technically permissible. Also, it is a requirement of the FAR's that pilots avoid flying within 500 feet of people, buildings and vehicles. 14 CFR § 91.79(c). The Special Master is persuaded by the weight of evidence that James Knight violated 14 CFR § 91.79(c) by flying closer than 500 feet to Mr. Evans, and his car, and Mr. Huff, and his trailer. Further, the decision to fly VFR under the weather conditions prevailing at the time made it probably certain that violations of § 91.79(c) would result, and was therefore an act of serious negligence on the part of James Knight.

10. Following the procedures set forth in FAR Part 77, Sparks Broadcasting notified the FAA's Great Lakes Regional Office of its proposal to construct the tower. The FAA's Obstruction Evaluation Specialist, following procedures contained in FAA Order 7400.2B, Procedures for Handling Airspace Matters, determined that the proposed tower would not constitute an obstruction to air navigation under 14 CFR § 77.23(a). This was dated February 15, 1974. In informing Sparks of this determination, the Specialist requested Sparks to submit the supplemental notice provided by 14 CFR § 77.13(b).

11. 14 CFR § 77.13(b) provides that, when requested, the proponent of a tower must give notice of the start of construction to the FAA at least 48 hours before construction begins. 14 CFR 77.13(c) provides that in any case the proponent must notify the FAA when the tower reaches its greatest height. Handbook 7400.2B, paragraph 1229, requires that when the Specialist receives these notices under § 77.13(b) and (c) he must forward the information to the National Flight Data Center (NFDC), which in turn informs the National Ocean Survey (NOS). The NOS, the agency responsible for the publication of aeronautical charts, including the Lake Huron Sectional Aeronautics chart, then verifies the information with the proponent and provides for the mapping of the information on the next chart edition scheduled for publication.

12. At request from FAA for an update on the proposed tower, on July 20, 1974, Mr. Norman Pike of Sparks Broadcasting returned the Project Status Request, FAA Form 7460–11. On the form, he stated that the Sparks Tower project was not abandoned, and added: "Expect construction of tower in late September 1974." Mr. Pike testified that this time–frame was merely his best estimate of when he hoped the tower would be constructed, and was not intended by him to be the notice in advance of actual construction required by 14 CFR § 77.13(b). He testified that the actual date for the start of construction, February 3, 1975, was set in mid–January by the construction company that erected the tower. He further testified that he would have provided the notice required by § 77.13(b) at that time, but was unaware of the requirement to do so. The Court finds that Mr. Pike's note of July 20, 1974, on the Form 7460–11 was not notice of start of actual construction as required by 14 CFR § 77.-13(b).

13. The FAA was first notified of the actual construction of the tower on April 17, 1975. The notice informed the FAA that the tower was completed and that it was lighted with the appropriate beacons. This information was duly passed to the NOS, which placed the tower on the next edition of the chart to be published, the 10th edition. The final date for submission of information for inclusion on the 8th Edition of the Lake Huron Sectional Aeronautical Chart, which was current at the time of the crash, was September 27, 1974.

14. Mr. Bernard Coogan, Defendant's pilot expert, testified that the primary purpose of sectional charts is for use in navigation, and that symbols appearing on the charts are placed there to enable a pilot to navigate visually by relating the symbol to its corresponding feature on the ground. The United States Government Specifications for Sectional Aeronautical, Tactical Pilotage, VFR Terminal Area Charts, 2d Edition February, 1975, states in Chapter 1 paragraph 2.a., that the sectional chart "is the primary navigational reference medium used by pilots operating under visual flight rules utilizing the ground environment as the primary aid to navigation . . .". Mr. Coogan testified that pilots are taught and are aware that the charts are published at six–month intervals. It follows that as the date for publication of the next edition of a chart approaches, the current chart becomes more out of date as new towers are constructed and scheduled for addition on the next published chart. Mr. Coogan testified that pilots are taught that one cannot rely on a sectional chart to portray each feature. Therefore, the Court finds that a pilot's reliance on a chart to portray all towers or other features would be unreasonable and an improper use of the chart.

15. The FAA received notice of the existence of the Sparks Tower on April 17, 1975. Possibly it should have informed itself prior to that time of the situation concerning the construction of the tower beginning in February of 1975. In any event, the Special Master finds that the FAA would not have done more than have the tower depicted on the next edition of the Sectional Chart, which would have been circulated after the crash.

16. Plaintiff argues that the FAA had a duty, once it knew of the Sparks Tower, to disseminate information regarding its loca-

tion and height to airmen. The FAA disseminates airmen information by the following three methods: (1) aeronautical charts, (2) Flight Information Publications, and (3) Notices to Airmen. The FAA emphasizes that:

"Note.–Changes occurring so rapidly that time does not permit issuance in a chart or the AIM are publicized via Notices to Airmen. Originators of airmen information are expected to inform the National Flight Data Center in sufficient time before the effective date of changes to permit publishing of aeronautical data on the various charts or in the AIM. Within the Pacific Region notify the Honolulu NOF. This leaves the NOTAM system free to carry out its mission–the handling of time–critical information which would affect a pilot's decision to make a flight. Information of an advisory nature that can be given to a pilot on an 'as needed' basis, either before departure, while en route, or before landing, is given local distribution as an Airmen Advisory."

(FAA Order 7110.10c, January 1, 1975, (Flight Services Manual) ¶ 480)

The FAA has established the policy that it will:

"(a)ccept and classify all Airmen information, regardless of source or subject matter, and disseminate as Notice to Airmen all information that is not otherwise available to airmen and other aviation interests and the lack of which may have an adverse effect on the safety of flight."

(FAA Order 7110.10c, January 1, 1975, (Flight Services Manual) ¶ 481)

The FAA further admits that the purpose of a Notice to Airmen is to disseminate information having an impact on the safety of flight. The FAA defines a Notice to Airmen as:

"A notice identified either as a NOTAM or AIRAD containing information concerning the establishment, condition, or change to any components of, of hazard in the National Airspace System, the timely knowledge of which is essential to personnel concerned with flight operations."

The two kinds of Notices to Airmen are further defined as follows:

"NOTAM. A Notice to Airmen in message form requiring expeditious and wide dissemination by telecommunications means."

"Airmen Advisory (AIRAD). A Notice to Airmen normally given only local dissemination, during preflight or inflight briefing, or otherwise during contact with pilots."

(FAA Order 7110.10c, January 1, 1975, (Flight Services Manual) ¶ 13)

Such AIRADs must be given local dissemination which the FAA defines as follows:

"Local dissemination includes the area served by the aid, service, or hazard being advertised, regardless of whether the facility is locally or remotely controlled. Disseminate NOTAM's and AIRAD's locally as follows:

a. Broadcast on navaid voice channels. Exception: It is not necessary to broadcast landing area information for those airports served by a tower during the hours the tower is in operation.

b. Forward to ATC facilities of primary responsibility.

c. Deliver to individual pilots during first contact either in a preflight briefing or in air–ground communications. Do not deliver landing area AIRAD's for those airports served by a tower during the hours the tower is in operation.

d. Deliver to aviation companies or interested user groups in accordance with local written agreements or by transmitting on local teletypewriters, electronic writers, or video circuits."

(FAA Order 7110.10c, January 1, 1975, (Flight Services Manual) ¶¶ 485, 486)

The Special Master finds that the information regarding the Sparks Tower was not appropriate for dissemination as a NOTAM. *See*, NOTAM criteria at ¶ 484 of FAA Order 7110.10c, January 1, 1975, (Flight Services Manual).

17. The more difficult question presented is whether the information regarding the Sparks Tower was appropriate for dissemi-

nation as an AIRAD. Paragraph 570 of the Flight Services Manual describes the conditions to be disseminated as AIRADs as follows:

"Disseminate as AIRAD's:

a. New construction such as TV towers, tall buildings, stacks, etc., for which obstruction lighting is required or recommended.

b. Obstruction light outages in proximity to an airport served by an ATCT. (Obstruction light outages meeting criteria as defined in 562.f. shall be NOTAMed during required illumination periods when the towers are not operating.)

c. Runway end identifier lights–REIL (unless they affect operating minima)."

FAA Order 7110.10c, January 1, 1975, (Flight Services Manual), ¶ 570.

Plaintiff argues that subparagraph (a) requires that precisely such information as that relating to the Sparks Tower be disseminated as an AIRAD. Defendant, on the other hand, takes the position that subsection (a) would only cover the Sparks Tower situation if the recommended or required lighting was inoperative. To support this view Defendant first points to the context of subparagraph 570(a), and second, relies upon testimony given by Robert Evans, a Flight Services employee, as to the interpretation given this subparagraph by Flight Services.

Relative to the context of 570(a), it must be observed that paragraph 570 is the only paragraph under Section 7 of the Flight Services Manual, and Section 7 is entitled "Lighting Aid Airads." Further, within paragraph 570, subparagraph (b) relates expressly to lighting aid outages, and subparagraph (c) merely identifies a type of lighting aid, leaving it to common sense to infer that this requires an AIRAD only if that type of lighting aid is discovered to be inoperative. Reasoning from this structural analysis, the FAA concludes that paragraph 570, even if unclearly worded, by implication only requires AIRAD dissemination when certain lighting aids are inoperative.

Mr. Robert Evans testified on the basis of his years of service with the FAA that Flight Service had to his knowledge always interpreted paragraph 570 as requiring an AIRAD only in the case of a lighting aid outage. There was no evidence presented that James Knight, or pilots generally, were familiar with the contents of the Flight Services Manual, and therefore there is no basis to conclude that James Knight may have relied upon a different interpretation of paragraph 570.

The Special Master, taking all of this into account, concludes that paragraph 570 would not have required the FAA to disseminate an AIRAD on the Sparks Tower unless the required or recommended lighting was inoperative. There was no evidence presented that any of the lighting on the Sparks Tower was inoperative.

Of course, the above analysis is not conclusive of the issue of whether the FAA had a duty to publish notice, either as an AIRAD or in some other form, of the construction of the Sparks Tower, at least until it could be depicted on the Sectional Chart. To resolve this issue it is necessary to resort to the "unreasonable risk of harm" standard of care in relation to the factual setting of this case. The relevant facts are that the Sparks Tower was not near controlled airspace or any landing field, and it did not impinge upon IFR airspace, which begins at 1000 feet above the ground. Therefore, no aircraft should ever be flying within dangerous proximity of the Sparks Tower except when the minimum conditions for VFR flight are satisfied. Under those conditions a pilot will have at least one mile of visibility, and be clear of all clouds. 14 CFR § 91.105. Hence any pilot flying under the maximum speed limit, 14 CFR § 91.70, would have ample time to see and avoid the Sparks Tower. Under these circumstances there could be no justifiable reliance upon FAA notification to avoid hitting a structure such as the Sparks Tower. This conclusion is supported by the testimony of both parties' pilot experts.

18. Plaintiff contends that James Knight was flying a straight line course

from Grayling to Flint and navigating by "dead reckoning."[1] Deposition testimony of witness Fred Huff, however, revealed that immediately prior to striking the tower James Knight was flying with his head at the window of the aircraft, looking down at the ground. The Special Master finds from this evidence that, at least over this portion of the trip, James Knight was relying upon visual reference to ground features to enable him to navigate. Under weather conditions such as those prevailing in the vicinity of the tower, visual navigation becomes very difficult, according to Bernard Coogan, the Defendant's pilot–expert witness, and it is easily conceivable that even an experienced pilot could become lost and blunder into striking the tower. Thus, even had the FAA taken reasonable steps to disseminate information on the Sparks Tower, it is unclear whether the crash of James Knight would have been avoided.

### CONCLUSIONS OF LAW

The following Conclusions of Law, insofar as they may be considered Findings of Fact are so found by this Court to be true in all respects.

1. This action is brought against the Defendant United States of America under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*

2. This Court has jurisdiction under 28 U.S.C. § 1346(b).

3. Michigan tort law is the law to be applied in this case. 28 U.S.C. § 1346(b); *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

4. Michigan has adopted a system of comparative negligence. *Placek v. City of Sterling Heights*, 405 Mich. 638, 275 N.W.2d 511 (1979).

5. Although the adoption of comparative negligence allows recovery by a negligent plaintiff, it does not change the burden that the plaintiff must meet in order to recover. Under Michigan law, negligence is conduct involving an unreasonable risk of harm. *Moning v. Alfono*, 400 Mich. 425, 254 N.W.2d 759 (1977). The elements of an action for negligence are the existence of a duty owed to the plaintiff, a breach of that duty, proximate cause, and damages. *Moning v. Alfono*, supra; *Roulo v. Auto Club of Michigan*, 386 Mich. 324, 192 N.W.2d 237 (1971).

6. Under the "statutory purpose doctrine" a Court may adopt as the standard of conduct of a reasonable man the requirements of a statute or administrative regulation the purpose of which is to protect a class of persons, including the injured party, where the statute or regulation was intended to protect against the type of hazard or harm suffered. *Ross v. Alexander*, 74 Mich.App. 666, 254 N.W.2d 605 (1977); *Thaut v. Finley*, 50 Mich.App. 611, 213 N.W.2d 820 (1973).

7. The Federal Aviation Regulations have the force and effect of law. *United States v. Schultetus*, 277 F.2d 322 (5th Cir.), *cert. den.* 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56 (1960). Pilots have a duty to comply with the Federal Aviation Regulations, and violation of them is negligence as a matter of law. *Gatenby v. Altoona Aviation Corp.*, 407 F.2d 443 (3rd Cir. 1969).

8. The pilot in command of an aircraft is directly responsible for, and has the final authority as to, the operation of that aircraft. 14 CFR § 91.3; *Miller v. United States*, 522 F.2d 386 (6th Cir. 1975).

9. James Knight flew in conditions of visibility of less than one mile and within clouds in violation of 14 CFR § 91.105. Had he maintained the one mile visibility required by that regulation, he would or should have seen the tower in time to avoid it. Testimony of Plaintiff's pilot expert witness confirmed that attempting this VFR flight in visibilities of one mile or less would be extremely hazardous. For violation of these regulations, and for failing to

---

1. "Dead Reckoning" is a procedure for navigation by following a pre–determined course by reference to compass directions, ground speed and elapsed time. It is similar to navigation under instrument flight rules.

see and avoid the tower, Knight was negligent. *Gatenby v. Altoona Aviation*, supra; *Meinen v. United States*, 13 CCH Avi. ¶ 18,297 (NDNY, 1976).

10. Having chosen to fly in IFR conditions, Knight had a duty to comply with the IFR procedures set forth in 14 CFR § 91.115 *et seq.* Section 91.119(a) requires that *for* flight under IFR, the pilot must fly at an altitude of at least 1000 feet above the highest obstacle, including the ground, within five miles of his course. The pilot is also required, by Section 91.115, to file a flight plan, which James Knight failed to do. Knight's violation of this regulation was negligent.

11. Mr. Knight's violation of 14 CFR §§ 91.119, 91.79, 91.105 and 91.115, his failure to see and avoid the tower, and his operation of his aircraft in an extremely hazardous manner, constitute careless and reckless operation in violation of 14 CFR § 91.9. The recklessness of his conduct is accentuated by the fact that he could easily have filed an IFR flight plan and flown the route under IFR in complete safety, at perhaps a minor cost in time and inconvenience.

12. There was no evidence that any employee of the United States failed to do what he should have done with regard to the publication of the 8th edition of the Lake Huron Sectional Aeronautical chart. The reason the Sparks Tower was not on that chart was because the chart was published before information concerning the actual construction of the tower was available. The Court finds no negligence on the part of any employee of the United States involved in any way with the publication of the 8th edition of the Lake Huron Sectional Aeronautical chart. Since pilots know that sectional charts are published at six month intervals, it is unreasonable for pilots to rely upon such charts to portray each and every tower that may in fact exist.

13. The Special Master finds there was no duty of a Flight Service Specialist to issue a NOTAM or AIRAD on the existence of a tower whose lighting system was operational. Therefore, there was no negligence on the part of the FAA in this regard.

14. The sole proximate cause of this crash was the negligence of Mr. Knight.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing findings of fact and conclusions of law, the Special Master hereby respectfully recommends that judgment be entered in favor of the Defendant United States of America.