In re AIR CRASH DISASTER AT MET-
ROPOLITAN AIRPORT, DETROIT,
MICHIGAN ON JANUARY 19, 1979.

Margaret MURRAY, Personal Represent-
ative of the Estate of William A.
Murray, Deceased, Plaintiff,

v.

MASSEY–FERGUSON, INC., a foreign
corporation, Gates Learjet Corporation,
a foreign corporation, Duncan Avia-
tion, Inc., a foreign corporation,
Management Jets International, Inc., a
foreign corporation, and Conrac Corp.,
a foreign corporation, jointly and sev-
erally, Defendants.

Margaret MURRAY, Personal Represent-
ative of the Estate of William A.
Murray, Deceased, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Nos. MDL–505, 80–74787 and 81–74854.

United States District Court,
E.D. Michigan, S.D.

April 11, 1984.

Arnold M. Gordon, Southfield, Mich., for
Margaret Murray.

Leonard E. Nagi, Detroit, Mich., for Mas-
sey Ferguson.

David J. Adams, Chicago, Ill., for Gates
Learjet.

Gary A. Maximuik, Detroit, Mich., for
Duncan Aviation.

Richard G. Santi, Des Moines, Iowa, for Management Jets.

Kent M. Forney, Des Moines, Iowa, for Conrac Corp.

Jan VonFlatern, Washington, D.C., for U.S.

## OPINION

FEIKENS, Chief Judge.

A Learjet plane crashed at Detroit Metropolitan Airport on January 19, 1979. William A. Murray, a passenger, was killed and his estate brings this action. Pursuant to a funding agreement, the three parties remaining in this case [1] paid $1,750,000 to the plaintiff in settlement of potential liability. They entered into a memorandum of settlement which permits each party to claim that it is entitled to contribution or indemnity from the other two, and each seeks reimbursement for funds paid to the plaintiff. My duty under the Federal Tort Claims Act (F.T.C.A.) is to decide the liability of the United States. For reasons stated herein, I hold that the United States is not liable for this accident, and is entitled to be reimbursed for funds paid to plaintiff. Heretofore in a jury verdict, the liability of Gates was determined to be 20%, and that of M.F./Management Jets International, 80%.

## I. INTRODUCTION

The Learjet N137GL crashed while attempting to land on Runway 9 at Detroit Metropolitan Airport at approximately 7:30 p.m. on January 19, 1979. The flight originated in Des Moines, Iowa, and was destined for Toronto, Canada, with stops scheduled in South Bend and Detroit. After one passenger deplaned in South Bend, the N137GL departed for Detroit. For reasons which are in dispute, the aircraft crashed while attempting to land on Run-

way 9. Both crew members and all four passengers were killed.

The plane, which was manufactured by Gates, was a Learjet Model 25D, with a Century III wing. The crew of N137GL, Allan Hogue and Craig Barrows, (pilot in command and co-pilot, respectively) were employees of M.F. Management Jets International owned the airplane. On the night of the accident, the Federal Aviation Administration (FAA) provided air traffic control services at Detroit Metropolitan Airport; specifically, Jack DeWolf was working the control position designated "local control."

Gates, it is claimed, negligently designed the Model 25D aircraft, and breached an implied warranty of its fitness. The pilots, and M.F./Management Jets International through principles of respondeat superior, it is claimed, negligently operated the aircraft. Finally, the United States, it is claimed, negligently provided air traffic control services to the N137GL. This case determines the relative fault,[2] if any, of the parties, and the allocations of liability will fix the obligations of the parties with respect to the settlement amount paid to the Murray Estate. This opinion must be read against the background of jury verdicts already entered against Gates and M.F./Management Jets International.

## II. FACTUAL BACKGROUND

The N137GL crossed the threshold of Runway 9 in wings level flight. It appeared to have been landing long, as it was seen airborne several hundred feet past the usual point on the runway that Learjets touch down. Some distance down the runway, the wings on the Learjet began to oscillate; at least two full oscillations were observed. The National Transportation Safety Board accident report shows that the right tip tank struck the runway, and

---

**1.** They are: Massey-Ferguson, Inc. (M.F.)/Management Jets International (considered one entity), Gates Learjet Corporation (Gates) and the United States.

**2.** Michigan Law applies to this case under *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed.

1188 (1938), and principles of indemnity, contribution, and comparative negligence apply. M.C.L.A. § 600.2925(a) and (b). See *Mayhew v. Berrien County Road Comm'n,* 414 Mich. 399, 326 N.W.2d 366 (1982).

the fatal cartwheel followed shortly thereafter.

The N137GL crashed because of aerodynamic stall.[3] A Learjet Model 25D with a Century III wing modification in a landing configuration (landing gear down and flaps down 40°) will stall at approximately 87 knots. This stall speed, however, assumes a "clean" wing. Flight tests indicate that even a small amount of a foreign material such as ice on the leading edge of the wing could disrupt the air flow over the wing and increase the speed at which the aircraft stalls.

Because the Learjet Model 23 (predecessor of the 25D) did not comply with FAA regulations requiring an airplane to give the pilot adequate warning of an impending stall, the Model 23 and 25D were equipped with an artificial stall warning and stall prevention system. The stall warning system was a stick shaker which warns the pilot of a stall by shaking the control column.[4] The stall prevention system was a stick pusher, which was designed to prevent a stall by pushing forward on the control column. This forces the nose of the aircraft down, decreases the angle of attack, and averts a stall.[5]

The N137GL encountered typical Michigan winter weather on the night of the accident. The temperature at Detroit Metro Airport was twenty degrees (20°) Fahrenheit. The cloud layer was less than 4,000 feet, with a ceiling of 2,200 feet above the ground. There may have been patches of light freezing drizzle below the clouds, although no precipitation was recorded on the ground until a few minutes after the crash. The winds were gusty at 10–15 knots. The visibility was good at 10–12 miles, and Visual Flight Rules (VFR) were in effect.

Due to the wind direction this night, all flights took off from and landed on Runway 9. A North Central 704 plane landed ahead of the N137GL, and a Delta 616 plane was scheduled to land immediately after the Learjet. A Delta 713 plane was cleared to takeoff after the North Central 704 plane landed and before the N137GL touched down.

When both departing and arriving aircraft use the same runway, as on the night of the accident, the air traffic controller has the duty to assure adequate spacing between aircraft. In this case, the FAA Air Traffic Control Manual (1979) § 12 requires a departing DC–9 to be 6,000 feet down the runway and airborne before an arriving Learjet crosses the runway threshold. DeWolf testified that he was using a visual separation standard. That is, he said that a minimum separation of 6,000 feet had been achieved when the departing plane reached a set of lights near the intersection of Runways 9 and 3R [6] before the landing aircraft crossed the runway threshold.

## III. DISCUSSION

### A. *Who is the Factfinder*

■ As a threshold matter, I must consider who the factfinder is for the various claims brought in this lawsuit. The posture in which this case arises presents a somewhat novel question: which claims require a jury determination, and which require a court determination. As the three parties to this case have settled the demands of the original plaintiff, what remains before me are the cross-claims for contribution and indemnity which each par-

---

3. An aerodynamic stall occurs when the air flow over the wing is disrupted, thereby destroying the lift necessary to sustain flight. The disruption of air flow over the wing is caused by the combination of two factors: the angle of attack, or the angle at which the wing meets the oncoming air, becomes too great, and the speed at which the wing meets the oncoming air becomes too slow.

4. The shaker was activated at 94 knots, or approximately seven knots above the stall speed.

5. The pusher was activated at 88 knots, or approximately one knot above the stall speed.

6. There are three parallel runways that intersect Runway 9: 3 Left, 3 Center, and 3 Right. 3L is the closest to the threshold of Runway 9; 3R is the furthest.

ty brings against the other two. To settle these cross-claims, the relative fault of each party, if any, must be allocated. The private litigants, Gates and M.F./Management Jets, have demanded a trial by jury to determine their allocation of fault, if any, as is their right under the Seventh Amendment.

Since the United States cannot be sued without its consent, *United States v. Sherwood,* 312 U.S. 584 (1941), the cross-claims which Gates and M.F./Management Jets bring against the United States arise under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–80 (jurisdiction conferred 28 U.S.C. § 1346). Section 2402 of the United States Code requires a trial by the court without a jury for any action brought under 28 U.S.C. § 1346, including F.T.C.A. claims. The United States' cross-claims against the other two parties, however, are not under the F.T.C.A., and Gates and M.F./Management Jets demand a jury trial on these claims. Gates argues that where the Government cross-claims for contribution or indemnity, the F.T.C.A. does not require both the court and the jury to act as factfinders. Once the United States assumes the role of a plaintiff, the liability of the joint tortfeasors should be judged by a single factfinder, and under the Seventh Amendment, this must be the jury. Gates relies mainly on *Georges v. Hennessey,* 545 F.Supp. 1264 (E.D.N.Y.1982). Gates also argues that the jury should be the only factfinder because the factfinder must be able to consider the fault, if any, of all parties in order to determine the pro rata share of liability of any one party. That is, the jury must be able to determine the United States' liability in order to allocate fault between the two private litigants.

I do not agree that this case can be decided by the jury as the sole factfinder. First, Gates has misapplied *Hennessey.* There, a motorcycle passenger brought an action against the motorcycle driver (Hennessey) and the United States for injuries sustained in a collision between the motorcycle and a U.S. Army vehicle. The jury exonerated the motorcycle driver, and issued an *advisory verdict* holding the U.S. fully liable. The Court stated:

> While the jury determined the non-liability of the [motorcycle driver], the liability of the Government could only be resolved by the Court pursuant to 28 U.S.C. § 2402. This is true in spite of the fact that the jury found the Government 100% liable. The verdict against the Government was merely advisory, to be wholly or partially accepted by the Court or completely rejected.

545 F.Supp. at 1265. The Court went on to hold that once the jury exonerated the private litigant, the Court could not reduce the amount of the Government's liability by holding the private litigant liable. Reducing the Government's liability "would completely nullify the collateral estoppel effect of the jury's verdict as to Hennessey and reduce the amount payable to the plaintiff on the theory that this court could still find Hennessey liable as a joint tortfeasor." 545 F.Supp. at 1266. This case stands for the limited proposition that a court may not nullify the effect of a jury verdict on co-defendants when deciding the United States' liability in F.T.C.A. cases. I agree with this proposition and do not intend my finding with respect to the Government's liability to nullify the jury verdict on the liability of Gates Learjet and M.F./Management Jets.

Second, the law is clear that I must allocate the fault, if any, of the United States. Section 2402 of 28 U.S.C. states: "Any action against the United States under Section 1346 *shall be tried by the court without a jury....*" (emphasis added). The language of the statute plainly manifests Congress' intent that the trial judge determine the liability of the Government in cases arising under the F.T.C.A. My conclusion is not altered by the fact that the United States brings cross-claims against Gates and M.F./Management Jets. *Poston v. United States,* 262 F.Supp. 22, 24 (D.Hawaii 1966) (Overruling United States' objection to use of advisory jury, the court noted that "the responsibility for the ultimate decision as to liability of the United States never shifts from the shoulders of the

judge...."); *Honeycutt v. United States,* 19 F.R.D. 229, 231 (W.D.La.1956) (In refusing to use an advisory jury, the court stated that under § 2402, Congress "intended that no jury of any kind be used in [F.T.C.A.] cases."); *Terminal Warehouse of New Jersey v. United States,* 91 F.Supp. 327, 328 (D.N.J.1950) ("It seems clear that [§§ 1346 and 2402] provide for the trial of a counterclaim [by the government] without a jury in an action of this kind." The court further stated that the Seventh Amendment did not alter this conclusion.). *See also McElrath v. United States,* 102 U.S. (12 Otto) 426, 440, 26 L.Ed. 189 (1880) ("Suits against the government in the Court of Claims, whether reference be had to the claimant's demand, or to the defense, or to any set-off, or counterclaim which the government may assert, are not controlled by the Seventh Amendment."); *Cargill, Inc. v. Commodity Credit Corporation,* 275 F.2d 745, 749 (2d Cir.1960) (The court held that it was error to grant private litigant's motion for a jury trial on the Government's counterclaim under the Charter Act. In holding that the bench trial provisions of the Charter Act are similar to those under the F.T.C.A., the court stated that "it was plain that a counterclaim in a suit in the District Court under the Tucker Act must be tried to the judge...." ) In short, the law is clear that the Court, not the jury, must determine the liability of the United States under the F.T.C.A.

■ Finally, it is suggested that I use an advisory jury under Rule 39(c) of the Federal Rules of Civil Procedure [7] to aid in my determination of the United States' liability. The cases disagree on the issue whether a trial court may use an advisory jury in F.T.C.A. cases. *Compare Poston v. United States, supra,* (holding that the court may order the jury to act as an advisory

jury on fact issues pertaining to the United States), *with Honeycutt v. United States, supra,* (holding that the court had no discretion to order an advisory jury in F.T.C.A. case).

Even if I do possess the discretion to use this jury in an advisory capacity, I exercise that discretion not to do so. I agree with Chief Judge Russell Smith that the use of advisory juries in F.T.C.A. cases creates more problems than it solves. If the advisory jury's opinion were consistent with mine, it would not be very useful. On the other hand, if the advisory jury's verdict differed from mine, I would have difficulty giving effect to it. *See Wright v. United States,* 80 F.R.D. 478 (D.Mont.1978).

■ In summary, the jury determines the liability of Gates Learjet and M.F./Management Jets as is their right under the Seventh Amendment, and I determine the liability, if any, of the United States, as is my duty under the F.T.C.A. Since the jury has found Gates 20% liable and M.F./Management Jets International 80% liable, and I find the United States not liable, the percentage of liability found by the jury is the final allocation of fault for this accident.

## B. *The Case Against the United States*

Gates Learjet asserts that the air traffic controller breached his duty to assure a minimum separation of 6,000 feet between the Delta 713 plane and the N137GL. Such negligence, it argues, combined with pilot error to proximately cause this accident. The pilot of N137GL decreased his speed before landing in an attempt to increase the inadequate and illegal separation provided by the controller. The pilot allowed the plane to slow too much, and the aircraft reached an aerodynamic stall.[8] Once

---

**7.** Rule 39(c) provides:

Advisory Jury and Trial by Consent. In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury or, except in actions against the United States when a statute of the United States provides for trial without a jury, the court, with the consent of

both parties, may order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right.

**8.** M.F./Management Jets International's theory of the case is that ice accumulated on the leading edge of the wing which increased the actual stall speed above the 87-knot stall speed publish-

stalled, the plane could not recover before crashing into the runway.

Under Michigan Law, negligence is conduct involving an unreasonable risk of harm. The elements of a cause of action for negligence are: 1) a duty owed by the defendant to the plaintiff; 2) a breach of that duty; 3) such breach proximately caused the plaintiff's injury; and 4) damages suffered by the plaintiff. *Chamberlain v. Bissell,* 547 F.Supp. 1067 (W.D. Mich.1982); *Knight v. United States,* 498 F.Supp. 316 (E.D.Mich.1980); *Roulo v. Automobile Club of Mich.,* 386 Mich. 324, 192 N.W.2d 237 (1971). The claiming party, moreover, has the burden of proving each element of the cause of action by a preponderance of the evidence. *Dyer v. United States,* 551 F.Supp. 1266, 1276 (W.D.Mich.1982).

■ In this case, it is clear that DeWolf was under a duty to exercise reasonable care in providing air traffic control services. As to the question of breach, there was abundant expert testimony at trial designed to reconstruct the events of January 19, 1979. Specifically, the expert witnesses disagreed over whether the Delta 713 plane was 6,000 feet down the runway and airborne when the N137GL crossed the threshold. Although evidence was offered at trial from which I could conclude that, on the night of the accident, the air traffic controller failed to exercise due care in performing his duties, I need not finally decide this question. I hold that even if the air controller was negligent, the evidence failed to establish that it was more likely so than not that such negligence was a proximate cause of this unfortunate accident.

Michigan law defines "proximate cause" as that which, in a natural and continuous sequence unbroken by any new, independent cause, produces the injury, and without which such injury would not have occurred. *Weissert v. City of Escanaba,* 298 Mich. 443, 452–53, 299 N.W. 139 (1941). *See McKine v. Sydor,* 387 Mich. 82, 88, 194 N.W.2d 841 (1972); *Michigan Sugar Co. v. Employers Mutual Liability Insurance Co.,* 107 Mich.App. 9, 14, 308 N.W.2d 684 (1981). *See generally* Callaghan's Mich. Civ.Jur. *Negligence* § 24 (1983).

In order to determine whether a defendant's negligence proximately caused an injury, the trier of fact must determine whether the injury was reasonably foreseeable in light of attending circumstances. *Nielsen v. Henry H. Stevens, Inc.,* 368 Mich. 216, 220–21, 118 N.W.2d 397 (1962); *Nash v. Mayne,* 340 Mich. 502, 508–09, 65 N.W.2d 844 (1954); *McLean v. Rogers,* 100 Mich.App. 734, 736–37, 300 N.W.2d 389 (1980). In this case, the evidence fails to establish that the air controller's (assumed) failure to provide adequate spacing produced this accident in a natural and continuous sequence, unbroken by any new, independent cause.

The reduction in the N137GL's speed to the point at which the plane would stall was not a natural, continuous and foreseeable result of the failure to assure minimum separation. Gates argues that the inadequate spacing caused the pilot to slow his aircraft, and that the accident resulted from the combined negligence of the air controller and the pilot. Yet, this causal chain beginning with the controller's negligence, is too remote to hold the United States liable for this accident. The evidence indicates that the pilot was concerned that the spacing might be a little tight; nonetheless, he elected to land the airplane. Gates' expert pilot, Carl Snow, testified that a pilot on a two-mile final approach who is concerned about spacing has two options: he could slow the plane in an attempt to increase spacing; or he could

---

ed in Gates Learjet's Aircraft Flight Manual. The plane could reach an aerodynamic stall before the stick pusher and shaker were activated. Thus, this condition was a design defect, and was the result of Gates Learjet's negligence. Whether the plane stalled at the published stall speed of 87 knots or somewhat higher is a

question for the jury. I am not concerned with whether the stall occurred due to the negligence of M.F./Management Jets International, Gates Learjet or both. Accordingly, when I refer to the plane stalling or being flown at a dangerously slow speed, I do not mean to imply that one party or the other exclusively was negligent.

execute a missed approach (or go around) and attempt a second landing. The uncontroverted evidence proved that the pilots could have successfully gone around at any time, even after N137GL crossed the threshold, and perhaps until the moment the plane stalled. While the lack of spacing may have been the pilot's motivation to slow the aircraft, it was the pilot who exercised his judgment to slow N137GL to an unsafe speed.

I find that the weather on the night of the accident did not present a situation in which the pilot was entirely dependent on the controller. To the contrary, visibility was good, and the pilots were flying under VFR. Snow testified, and his videotaped flight tests supported this, that a pilot on a two-mile final approach on the night of the accident would have had a clear view of the runway. He would have been able to see whether the Delta 713 plane was on Runway 9 and in position to take off, or whether the Delta 713 plane was still on the adjacent taxiway. He would also have been able to see whether the Delta 713 plane was "rolling good" as the air controller indicated.[9] If, contrary to the air con-

---

9.  This portion of the transcript of transmissions between the controller and various planes in the vicinity of Metro Airport begins when Delta 713 first makes radio contact with the local controller (LCL), and ends when the controller tells Delta 616 to go around due to the accident. The times given are Greenwich Mean Time, which is five hours ahead of Detroit local time.

| | | |
|---|---|---|
| 0031:37 | LCL | DELTA SEVEN THIRTEEN ARE YOU ON THE FREQUENCY WITH ME |
| 0031:39 | DL713 | JUST CHANGED OVER SIR |
| 0031:41 | LCL | ALRIGHT AH VERY SLICK THERE |
| 0031:43 | DL713 | AH YEAH YES SIR IT SURE IS |
| 0031:46 | LCL | ALRIGHT HOLD SHORT THEN I WAS GOING TRY AN SP . . SPACE YOU BETWEEN THESE TWO BUT AH IT'S AH LITTLE TIGHT |
| 0031:50 | UNK | * (CONFIRM – UNINTELLIGIBLE – IS CLEARED TO LAND) |
| 0031:53 | LCL | OKAY YOU WERE BLOCKED THAT TIME UH SEVEN GOLF LIMA CLEARED TO LAND ON RUNWAY NINER |
| 0031:57 | N137GL | SEVEN GOLF LIMA |
| 0031:59 | NC704 | AND CONFIRM SEVEN OH FOUR IS CLEARED TO LAND |
| 0032:01 | LCL | AFFIRMATIVE CLEARED TO LAND NORTH CENTRAL SEVEN OH FOUR |
| 0032:03 | NC704 | SEVEN OH FOUR |
| 0032:20 | LCL | DELTA SEVEN AH THIRTEEN AH TAXI INTO POSITION HOLD THAT TRAFFIC'S STILL AH THREE AN AH HALF OUT ON FINAL |
| 0032:28 | DL713 | OKAY ON TO HOLD DELTA SEVEN THIRTEEN |
| 0032:30 | LCL | AND AH SEVEN GOLF LIMA I'M GONNA PUT THAT DELTA OFF IN FRONT OF YOU IT'S VERY SLICK WHERE HE'S TURNING THE CORNER THERE IT LOOKS LIKE IT'S GONNA WORK OUT |
| 0032:37 | N137GL | OKAY |
| 0032:39 | LCL | NORTH CENTRAL SEVEN OH FOUR LEFT TURN OFF GROUND ONE TWO ONE POINT EIGHT WHEN YOU'RE CLEAR |
| 0032:43 | NC704 | SEVEN OH FOUR |
| 0032:44 | LCL | DELTA SEVEN THIRTEEN FLY HEADING OF ZERO NINER ZERO YOU'RE CLEARED FOR TAKEOFF ON RUNWAY NINER |
| 0032:48 | DL713 | ZERO NINE ZERO CLEARED FOR TAKEOFF DELTA SEVEN THIRTEEN |
| 0032:53 | DL616 | DELTA SIX ONE SIX WITH YA AH JUST PAST WILLOW RUN |
| 0032:55 | LCL | DELTA SIX ONE SIX NUMBER TWO TRAFFIC'S A TWO MILE FINAL AHEAD OF YA |
| 0032:59 | DL616 | OKIE DOKE |
| 0033:37 | N137GL | AH COULD WE HAVE A WIND CHECK |
| 0033:39 | LCL | YES SIR THE WIND IS ONE TWO ZERO AT ONE ONE HE'S ROLLING GOOD NOW LOOKS LIKE SPACINGS GONNA BE ADEQUATE HE'S GOING TO BE AIRBORNE BEFORE YOU CROSS THE THRESHOLD |
| 0033:47 | N137GL | OKAY IS HE A TWENTY SEVEN OR A EIGHT |
| 0033:49 | LCL | IT'S A AH D C NINE |

troller's calls, the Delta 713 plane was not in position to take off and was not "rolling good" at approximately 0033:39, the pilot would have observed "a complete contradiction." (Testimony of Snow, transcript p. 421). Yet, armed with his own observations, the pilot failed to go around and continued to fly the N137GL at an unsafe speed. An air traffic controller "is not required to foresee or anticipate the unlawful, negligent, or grossly negligent acts of pilots." *Colorado Flying Academy, Inc. v. United States*, 506 F.Supp. 1221, 1228 (D.Colo.1981); *Baker v. United States*, 417 F.Supp. 471, 486 (W.D.Wash.1975). Because the air controller was not required to anticipate or foresee N137GL's dangerous decrease in speed, I find that his negligence, if any, did not proximately cause this accident.

Moreover, FAA regulations provide that "[t]he pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft," 14 C.F.R. § 91.3(a), and that "[n]o person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another." 14 C.F.R. § 91.9. The case law clearly indicates that although the air traffic controller has a duty to exercise reasonable care, "under VFR conditions, the primary responsibility for safe operation of the aircraft rests with the pilot, regardless of traffic clearance." *Coatney v. Berkshire*, 500 F.2d 290, 292 (8th Cir.1974). *See Redhead v. United States*, 686 F.2d 178, 183 (3d Cir.1982); *In Re Aircrash Disaster at New Orleans (Moisant Field), Louisiana on March 20, 1969*, 544 F.2d 270, 276 (6th Cir.1976); *Bi-*

*bler v. Young*, 492 F.2d 1351, 1358 (6th Cir.), *cert. denied*, 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974); *Spaulding v. United States*, 455 F.2d 222, 226–27 (9th Cir.1972). ("The controller's duty to warn does not, however, relieve the pilot of his primary duty and responsibility. The pilot has a continuing duty to be aware of danger when he can gather adequate information with his own eyes....") Holding the air controller liable for this accident would "shift primary responsibility for the operation of an airplane from the pilot who is flying it to the controller on the ground. The total thrust of the applicable FAA Regulations, however, is to the country." *In Re Aircrash Disaster at New Orleans, supra*, at 276. In the present case, the crew, not the air controller, bore the ultimate responsibility for the safe operation of N137GL. Accordingly, the controller does not bear responsibility for the consequences of the pilot's decision to decrease the speed of N137GL.

## IV. CONCLUSION

For the reasons stated above, I find that the United States is not liable for this accident. The jury verdict allocating 80% liability to Massey-Ferguson and 20% liability to Gates Learjet is the final allocation of fault.

An appropriate order may be presented.

| 0034:03 | LCL | AND THE BRAKING IS GOOD ON THE RUNWAY YOU NEEDN'T ACKNOWLEDGE THAT WIND NOW IS ONE ONE ZERO AT ONE TWO |
|---|---|---|
| 0034:08 | N137GL | THANK YOU |
| 0034:21 | WIS706 | WISCONSIN SEVEN OH SIX JUST WENT BY THE V O R |
| 0034:24 | LCL | WISCONSIN AH SEVEN OH SIX ROGER NUMBER TWO |
| 0034:27 | WIS706 | OKAY |
| 0034:28 | LCL | DELTA SEVEN THIRTEEN CONTACT DEPARTURE CONTROL HAVE A GOOD NIGHT SIR |
| 0034:31 | DL713 | THANK YOU SIR |
| 0034:43 | LCL | AND DELTA SIX ONE SIX GO AROUND |