Peter **KARMANOS**, **Jr., Peter Karmanos, III, and Compuware Hockey Club, Plaintiffs,**

v.

Deane **BAKER, Paul W. Brown, Neil D. Nielsen, Sarah Goddard Power, Thomas A. Roach, Veronica Latta Smith, Nellie M. Varner, James L. Waters, individually and as members of the University of Michigan Board of Regents, Harold T. Shapiro, individually and as President of the University of Michigan, Don Canham, individually and as Athletic Director of the University of Michigan, the National Collegiate Athletic Association, and John Doe and Richard Roe, jointly and severally, Defendants.**

No. 85–CV–60089–AA.

United States District Court, E.D. Michigan, S.D.

Sept. 13, 1985.

As Amended Sept. 23, 1985.

Erwin B. Ellman, Levin, Levin, Garvett & Dill, Southfield, Mich., for plaintiffs.

Peter A. Davis, David & Fajen, Ann Arbor, Mich., for defendants Baker, Brown, Nielsen, Power, Roach, Smith, Varner, Waters, U–M Bd. of Regents, Shapiro and Canham.

Edmond F. Devine, Miller, Canfield, Paddock & Stone, Ann Arbor, Mich., for defendant Nat. Collegiate Athletic Ass'n; Swanson, Midgley, Gangwere, Clarke & Kitchin, Kansas City, Mo., of counsel.

## OPINION

FEIKENS, Chief Judge.

This case involves the issues of the claimed federal constitutional rights of Peter Karmanos III and his father, Peter Karmanos Jr., and whether, if these rights exist, they were violated by defendants National Collegiate Athletic Association ("NCAA"), the Regents of the University of Michigan, Harold Shapiro, President of University of Michigan, and Don Canham, Athletic Director of University of Michigan, ("University defendants"), when Karmanos III was determined ineligible to play intercollegiate hockey. Additionally, Karmanos Jr. and his company, Compuware Hockey Club ("Compuware") claim antitrust and interference with contract damages based upon alleged communications between NCAA and the Detroit Red Wings professional hockey team.

Jurisdiction is based upon 28 U.S.C. §§ 1331, 1343, and 2201.

## I. BACKGROUND

The matters before me are defendants' Motions to Dismiss or, in the alternative, for Summary Judgment. In analyzing whether I should grant the Motions to Dismiss, I must view the alleged facts in a light most favorable to plaintiffs, but any statement of the alleged facts should not be interpreted as findings by me.

Peter Karmanos III, a resident of Michigan, went to Quebec, Canada to complete his last two years of high school. While in

Quebec, Karmanos III joined the Canadian Major Junior A hockey league. He played with Club de Hockey Les Voisin de Laval and Club de Hockey de Verdun. The clubs are professional hockey teams in that some or all players are paid for playing. Karmanos III, however, added a rider to his contract which stated that he would not be compensated. Karmanos Jr. paid all costs and expenses of his son's maintenance and support.

While playing hockey in Canada during 1984, Karmanos III was recruited by John Giordano and Mark Miller, hockey coaches for the University of Michigan. The coaches represented to Karmanos III that the University of Michigan would protect his right to try out for the University's intercollegiate hockey team and, if necessary, would vigorously challenge any NCAA rule which cast doubt on his eligibility.

Plaintiff enrolled at the University of Michigan and began his college education in August, 1984. On September 10, 1984, Karmanos III submitted a statement of his hockey experience and reasons he should not be deemed a professional hockey player to Dr. Gikas, University of Michigan Representative for Intercollegiate Athletics. Exhibit C–1, NCAA's Motion to Dismiss. In late September, Karmanos III participated in practice sessions, in which practice participants are rated by University of Michigan hockey coaches.

Based upon Karmanos III's statement and the NCAA Constitution, Article III, Section I, Karmanos III was considered a professional hockey player:

An individual may participate singly or as a member of a team against professional athletes; but if the individual participates or has ever participated on a team known to the individual or which reasonably should have been known to the individual to be a professional team in that sport, that individual no longer shall be eligible for intercollegiate athletics in that sport.

A professional team shall be any organized team which is a member of a recognized professional sports organization, which is directly supported or sponsored by a professional team or professional sports organization, which is a member of a playing league that is directly supported or sponsored by a professional team or professional sports organization or on which there is an athlete receiving directly or indirectly payment of any kind from a professional team or professional sports organization for the athlete's participation.

NCAA Constitution, Article III, Section 1.

Dr. Gikas initiated a hearing proceeding with the Eligibility Committee of the NCAA. *See* Exhibit B, NCAA's Motion to Dismiss. The basis of the proceeding was that even though Karmanos III was by definition a professional hockey player because he played on a professional team, he was not compensated for doing so.

A telephone conference call hearing regarding Karmanos III's eligibility was arranged, and Karmanos III was notified of the hearing one or two days in advance. Karmanos III attended the hearing on October 4, 1984, and the NCAA Eligibility Committee voted to deny the University's appeal for Karmanos III's eligibility.

The University informed Karmanos III that it would not pursue restoration of his eligibility through state or federal court litigation. Karmanos III was given the option, however, of presenting his case to the NCAA Council's Subcommittee on Eligibility Appeals in person or through a telephone conference hearing. A proposed in-person hearing date of mid-April, 1985, was set, but Karmanos III filed this lawsuit on February 27, 1985, and abandoned his NCAA eligibility appeal.

Karmanos Jr. and Compuware also sue for antitrust and interference with contractual relations damages. These claims arise from a letter sent by the NCAA to the General Manager of the Detroit Red Wings professional hockey team. The letter stated that "an ice hockey team which includes on its roster an individual who is receiving payments for his participation on that team from a professional sports organization would be considered a professional team

under NCAA legislation." Plaintiffs' Exhibit D. If the Compuware team was considered professional, all of the players on the team could lose their amateur status. The letter was prompted by a question whether one of the participants in the Compuware summer hockey program was being paid by the Red Wings to participate.

Karmanos Jr. and Compuware allege that the Compuware team was damaged by the NCAA's letter because players who wished to retain their amateur status were reluctant to participate in the Compuware hockey program.

## II. DISCUSSION

■ Plaintiffs have sued the University of Michigan Board of Regents as an official board and as individuals. In their official capacities the Board of Regents are an agency of the state, *see Ewing v. Board of Regents of University of Michigan*, 552 F.Supp. 881 (E.D.Mich.1982), *rev'd on other grounds*, 742 F.2d 913 (6th Cir.1984); *Marwil v. Board of Regents*, Civil Action No. 79–7331 (E.D.Mich., July 3, 1980), and as such, they are immune from suit. *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S.Ct. 3057, 3057, 57 L.Ed.2d 1114 (1978). Plaintiffs have not alleged that the State of Michigan has consented to suit, and I hold that they have not. Therefore, I dismiss the University of Michigan Board of Regents in their official capacities. In any event the Board, qua Board, is not a necessary party to grant the relief sought.

The remaining University defendants argue that the Karmanos III's claims against them are moot because Karmanos III was not ranked high enough during his practice sessions to gain a position on the University team. Karmanos III, however, remains a student at University of Michigan and may attempt to play on the hockey team again. If I held his claims moot, defendants' allegedly wrongful acts would evade review because these acts could recur during Karmanos III's remaining years at the University. Thus, I hold that Karmanos III's claims are not moot.

■ Count I of plaintiffs' Complaint claims that defendants deprived Karmanos Jr. of his right to direct the upbringing and education of his child. By not allowing Karmanos III to play NCAA intercollegiate hockey, Karmanos Jr. argues that defendants have deprived him of this right without procedural and substantive due process of law. I hold, however, that Karmanos Jr. was not deprived of his right to direct the upbringing of his child. He chose to send his child, Karmanos III, to Canada to expose him to a different culture as well as to develop his hockey skills. Defendants did not prevent this opportunity; it occurred. Even if defendants' classification of Karmanos III as a professional could be viewed as an interference of Karmanos Jr.'s upbringing of his son, I hold as a matter of law that it is not a constitutional violation. The right to direct the upbringing and education of one's child does not extend so far as to give a father a right to direct his child to play hockey on a professional team without the child losing amateur status.

The Supreme Court has long recognized the constitutional stature of parental rights to the upbringing of their children. *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). The Supreme Court and the United States Court of Appeals for the Sixth Circuit have recognized, however, that these parental rights are not absolute. *See Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); *Sims v. Waln*, 536 F.2d 686, 689 (6th Cir. 1976). It is clear to this Court that parental rights do not extend to the point for which Karmanos Jr. argues.

Many of plaintiffs' arguments as to Count I contain a central logical flaw. If I were to hold that defendants are precluded from considering Karmanos III ineligible because such an act violates Karmanos Jr.'s right to direct the upbringing of his child, then logically I should do so even if Karmanos III were compensated for participating in the Canadian hockey league. The sole determining factor then becomes whether the father directed his son to par-

ticipate. I refuse to adopt such an approach to this claim. Accordingly, I dismiss Karmanos Jr.'s parental rights claim in Count I. I also dismiss Karmanos Jr.'s parental rights claim in Count VII for the reasons stated *supra.*[1]

In Count VI there is a claim that defendants negligently performed the contract between the NCAA and its member institutions to protect amateur athletes and amateur athletics. Plaintiffs argue that they are beneficiaries of this contract and that they are entitled to relief based upon negligent performance. This theory is recognized in Michigan law. *See Chamberlain v. Bissell, Inc.,* 547 F.Supp. 1067 (W.D. Mich.1982); *Hart v. Ludwig,* 347 Mich. 559, 79 N.W.2d 895 (1956).

> The fact that no actionable breach of contract may have occurred does not preclude a finding that the performance of a contractual undertaking has been negligent and resulted in harm to the other contracting party or to a third person.

547 F.Supp. at 1067.

This negligent performance claim is pendent. Complete diversity does not exist between plaintiffs and defendants. I question whether I have the power to hear such a pendent claim against University of Michigan officials in light of the Supreme Court's holding in *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). In any event, it is within my discretion to entertain a pendent claim, and I decline to exercise my discretion. Accordingly, Count VI is dismissed without prejudice.

█ Since Karmanos Jr.'s and Compuware's claims in Counts I, VI and VII are dismissed, plaintiffs have only their antitrust and interference with contract claims remaining. As mentioned earlier, the latter claims are based on a letter sent by the NCAA to the Detroit Red Wings and the alleged resulting harm to plaintiffs. The facts relating to these claims are separate from the Karmanos III claims. The Karmanos III claims arise from defendants' ruling that Karmanos III is a professional hockey player who is ineligible to play amateur intercollegiate hockey. Karmanos Jr. joined in this action with his son because the constitutional claims based on Karmanos Jr.'s "right to direct the upbringing of his son" asserted a right to relief based upon the same transactions or occurrences and sharing common factual or legal questions with Karmanos III's claims. *See* Fed. R.Civ.P. 20(a). Mere assertion of joint claims and common legal issues, however, is not sufficient to preclude misjoinder. "In spite of the great liberality of Rule 20(a), the rule does not excuse any of the joined parties from the obligation to state a claim against defendant or defendants upon which relief may be granted." C. Wright & A. Miller, 7 Federal Practice and Procedure § 1656 at 284–85 (1972).

█ I have held that Karmanos Jr.'s assertions of constitutional violations do not state a claim upon which relief may be granted; thus, Karmanos Jr. and Compuware fail to meet the joinder requirements of Rule 20(a).[2] The remedy for misjoinder is provided in Rule 21, which states:

> Misjoinder of parties is not ground for dismissal of an action. *Parties may be dropped* or added *by order of the court* on motion of any party or *of its own initiative at any stage of the action and on such terms as are just.* Any claim against a party may be severed and proceeded with separately.

Fed.R.Civ.P. 21 (emphasis added). Pursuant to Rule 21, I retain jurisdiction over the primary action but drop Karmanos Jr. and Compuware as parties. Accordingly, Karmanos Jr.'s and Compuware's antitrust and interference with contractual relations claims are dismissed without prejudice.

The remaining claims in this suit are the claims of Karmanos III (hereinafter "plaintiff") in Counts II, III and IV.

---

**1.** Karmanos III argues that he has a right to receive such guidance from his father. I shall treat this claim as included in Counts II(a) and (b).

**2.** Karmanos Jr. and Compuware also do not meet the requirements for indispensable or necessary parties under Fed.R.Civ.P. 19.

In Count II plaintiff alleges that defendants deprived him of his property or liberty interests without due process of law, in violation of the Constitution. Count II is divided into ten subparts (II(a)–(j)), each listing an interest of which plaintiff claims he was deprived. I shall analyze each subpart *infra.*

■ Count II(a) claims that defendants deprived plaintiff of his "fundamental right to free public and secondary education and his fundamental right to equal educational opportunity at the college level." Count II(b) claims that defendants deprived plaintiff of his "fundamental right to acquire useful knowledge, to be free in the enjoyment of his faculties and to pursue such occupations and avocations as are most suitable and congenial to his personal development and enjoyment." While I question whether these interests are fundamental or even whether they are property or liberty interests for due process analysis, I first address a primary flaw in plaintiff's claim. Plaintiff has failed to allege any acts of defendants which infringe these interests. Defendants have not refused to allow plaintiff to pursue his education at the University of Michigan; in fact, plaintiff is a matriculated undergraduate student at the University now in his sophomore year of studies. Defendants have not restrained plaintiff from pursuing a career of professional hockey; he remains free to re-enter a professional hockey contract at any time. The only restriction that defendants have imposed upon him is the opportunity to play intercollegiate hockey because of plaintiff's professional status.

■ The law is clear in this circuit that a person does not have a liberty interest subject to due process protection to participate in interscholastic athletics. *See Hamilton v. Tennessee Secondary School Athletic Association,* 552 F.2d 681 (6th Cir.1976); *see also Mitchell v. Louisiana High School Association,* 430 F.2d 1155 (5th Cir. 1970); *Bailey v. Truby,* 321 S.E.2d 302 (W.Va.1984).

For better or worse, the due process clause of the fourteenth amendment does not insulate a citizen from every injury at the hands of the state. "Only those rights, privileges and immunities that are secured by the Constitution of the United States or some Act of Congress are within the protection of the federal courts. Rights, privileges and immunities not derived from the federal Constitution or secured thereby are left exclusively to the protection of the states." [Quoting from 1 W. Barron & A. Holtzoff, Federal Practice § 37 at 200 (Wright ed. (1960)]. The privilege of participating in interscholastic athletics must be deemed to fall in the latter category and outside the protection of due process.

552 F.2d at 682 (quoting *Mitchell v. Louisiana High School Athletic Association,* 430 F.2d 1155, 1157–58 (5th Cir.1970)).

■ Plaintiff also has not demonstrated that he has a property interest in participating in NCAA intercollegiate hockey on the University of Michigan hockey team. Property interests for due process purposes are defined by an independent source such as state law, *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), and plaintiff has not cited any authority for the proposition that he has such a property interest. Because of this and because plaintiff has not alleged any acts by defendants which deprive him of educational or vocational opportunities other than the opportunity to play intercollegiate hockey, I dismiss Counts II(a) and (b) with prejudice.

■ Count II(c) claims that defendants deprived plaintiff of his "right to travel throughout the United States and, subject to valid Congressional regulation, abroad, without condition or qualification retroactively imposed." Plaintiff has not alleged any burden on his right to travel, and I cannot conceive how defendants' alleged acts imposed anything more than a *de minimus* burden. Accordingly, I dismiss Count II(c) with prejudice.

■ Count II(d) claims that defendants deprived plaintiff of his "right to be free from ex post facto laws and regulations

and bills of attainder." This claim seems far-fetched. Plaintiff has not alleged that defendants have added or changed any rules since plaintiff signed his contract with the Major Junior A hockey league. It is undisputed that the rule which renders plaintiff a professional has been in effect since 1980, three years before plaintiff joined the Major Junior A league. I therefore dismiss Count II(d) with prejudice.

Count II(e) claims that defendants deprived plaintiff of his "right of free assembly and association, whether for political, social, recreational or educational interests." This is a novel theory on which to challenge NCAA amateur eligibility rules. Apparently, plaintiff is claiming that defendants are penalizing him for his association with Canadian hockey players by not allowing plaintiff to play intercollegiate hockey at the University of Michigan.

It is clear that plaintiff has a liberty interest in his right to associate guaranteed by the first amendment of the Constitution, but I hold that defendants have not deprived plaintiff of this right. The mere fact that defendants consider plaintiff ineligible for participation in intercollegiate hockey cannot be said to deprive plaintiff of his right of association. A due process claim requires a protected liberty or property interest as well as a denial or deprivation of that interest. Defendants' alleged acts do not amount to a deprivation of the interest enunciated in Count II(e). Plaintiff has been and is free to associate with whomever he chooses; defendants have not and do not regulate such association. The only deprivation that plaintiff faces is of his claimed "right" to contract and play hockey with a professional hockey team and retain his amateur status. I hold that plaintiff has no such constitutional right. The question whether plaintiff could have lost his amateur status for playing in an informal hockey game with friends, one or more who are professionals, might warrant a different result; that question, however, is not before me. The question before me is whether plaintiff, who signed a contract and played hockey with a professional team

and had knowledge that such an act would jeopardize his amateur status, is being deprived of his constitutional first amendment freedom of association when classified as a professional. I hold that he is not and, accordingly, dismiss Count II(e) with prejudice.

I add that if I had held that defendants' acts deprived plaintiff of his right of association, it would follow that any hockey player on any team, whether he receives compensation or not, must be eligible to participate on the University of Michigan hockey team. Clearly, this is contrary to existing law, and I do not adopt such an approach here.

Count II(f) claims that defendants deprived plaintiff of his "right to control, exercise and develop his own body." Again, I cannot accept plaintiff's argument that he was deprived of this right. He has been and remains free to exercise and develop his body in any way he chooses, except on the University of Michigan hockey team. I earlier held that participation on the team is not a protected liberty or property interest, and I refuse to allow plaintiff to seek relief against defendants based either on rights which he does not have or on alleged deprivations of rights which did not occur. Accordingly, I dismiss Count II(f) with prejudice.

Count II(g) claims that defendants deprived plaintiff of his "right to a full college education which the state has seen fit to provide." Plaintiff has cited no authority to support the proposition that he has a liberty or property interest in a full college education and, in particular, in playing intercollegiate hockey. Accordingly, I dismiss Count II(g) with prejudice.

Count II(h) claims that defendants deprived plaintiff of his "right to fair and just treatment in the course of legislative and executive investigation and hearing, as assured by Article I, Section 17 of the Michigan Constitution of 1963." I question whether the eligibility determinations of the NCAA and University defendants are covered by this language of the Michigan Constitution. I base my decision, however,

on a different ground. Plaintiff has made no allegation that the hearing or investigation surrounding his eligibility was unfair. Plaintiff is blurring the distinction between an allegedly unfair athletic eligibility rule and an allegedly unfair legislative or executive hearing or investigation. Given plaintiff's lack of allegation of the latter, I dismiss Count II(h) with prejudice.

Count II(i) claims that defendants deprived plaintiff of his "right to be free from damage and injury as a consequence of monopolies and restraints of trade prohibited by the laws of the United States and the State of Michigan." I find this claim to be far-fetched. *See* discussion of Count II(d), *supra.* The antitrust laws of the United States and Michigan, in this case, do not give plaintiff a property or liberty interest subject to due process protection. Plaintiff's attempt to bootstrap an antitrust claim into a constitutional claim is inappropriate. Accordingly, I dismiss Count II(i) with prejudice.

 Count II(j) claims that defendants deprived plaintiff of his "property rights in the contractual commitments made by the University to him as a student enrolled at the University." Plaintiff, however, does not indicate the basis of such contractual commitments. There are no allegations that the University of Michigan contracted to allow plaintiff to play hockey notwithstanding his professional status. The only circumstance in plaintiff's allegations that could arguably create such a commitment is the representations made by the University of Michigan hockey coaches while plaintiff was in Canada. These mere representations, however, do not rise to a property or liberty interest which require due process protection. *See Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Shamie v. City of Pontiac,* 620 F.2d 118 (6th Cir.1980).

The Supreme Court has held that representations which create only a mere expectancy are not protected by procedural due process. *See Perry,* 408 U.S. at 603, 92

S.Ct. at 2700. In *Shamie,* the United States Court of Appeals for the Sixth Circuit interpreted *Perry.* Shamie and the City of Pontiac's attorney agreed that if the city denied his liquor license application, it would provide reasons for the denial. The representation was made to this Court during a preliminary hearing of Shamie's 42 U.S.C. § 1983 suit against the City, and I embodied the representation in a court order. Shamie's application was denied without reason six months later.

I held that the City had deprived Shamie of a property interest in the agreement without due process when it breached the agreement. On appeal, however, the Sixth Circuit held that "the City's promise to tell him why his application might be rejected does not automatically confer on him a 'property interest' protected by constitutional due process." 620 F.2d at 121. The Court distinguished *Shamie* from cases in which benefits that have been conferred are taken away, i.e., a welfare recipient's loss of benefits, parolees threatened with revocation of parole or probation, wage earners against whom an order of attachment is sought, or a driver who faces revocation of his driver's license.

In this case plaintiff never received the benefit which he alleges is being taken away. Any alleged representation made by the coaches of University of Michigan created only an expectation of a benefit which did not, in and of itself, endow plaintiff with due process protection. Accordingly, I dismiss Count II(j) with prejudice.

Thus, Count II is dismissed in its entirety.

 Count III claims that defendants "summarily relegated [plaintiff] to second class citizenship at the University without reasonable notice, or opportunity to defend himself through counsel," and that such acts deprived plaintiff of procedural due process. Count III further claims that "at no time was [plaintiff] advised that he was to be deprived of educational opportunities at the University by reason of prior recreational and educational activities undertaken

by him on his own time, in another country, and at the exclusive cost to his family." Based upon the undisputed facts, however, plaintiff was or should have been aware of the possibility of losing his amateur status before he signed the contract with the Major Junior A league. According to plaintiff's Complaint, paragraph 19, the NCAA made a determination that the Canadian Major Junior A hockey league was a professional hockey league in 1980—three years before plaintiff entered into a player's contract with the league. It is also uncontested that the NCAA rules stated that an individual who participates on a professional team no longer shall be eligible for intercollegiate athletics in that sport. *See* Complaint, para. 17. I have difficulty with plaintiff's claim that he was not advised that his participation on a professional hockey team would jeopardize his eligibility to play intercollegiate hockey.

On June 26, 1980, over three years prior to the date plaintiff entered the contract with the Major Junior A league, defendant NCAA sent a memorandum to Directors of Athletics of member institutions sponsoring the sport of ice hockey. The memorandum stated that it appeared that Major Junior A ice hockey teams in both United States and Canada would be deemed professional teams within NCAA rules because such teams have professional players assigned to them or have athletes who are receiving payments from professional sports organizations. *See* Exhibit I, NCAA's Motion to Dismiss. This interpretation of NCAA's rules was published in the *NCAA News* on July 15, 1980.

It is undisputed that plaintiff sought and received assistance of counsel in entering into the contract with the Major Junior A league. The top of the first page of the contract states:

IMPORTANT NOTICE TO PLAYER [six-point type]

(1) Before signing the contract you should (A) consult a barrister, solicitor or lawyer of your choice as to the advisability of signing this contract and to obtain his explanation and

opinion as to the obligations imposed upon you and the benefits to which you are entitled hereunder....

Page four of the contract contains a "Certificate of Independent Advice" which states that Charles J. Carson of the Michigan Bar conferred with plaintiff "as to the advisability of his signing this Standard Player's Contract." The certificate further stated that attorney Carson placed plaintiff's "position and the consequences of his signing this Standard Player's Contract fully and plainly before him and he declared that he fully understood the nature and effect of said Standard Player's Contract...." At a minimum, plaintiff should have known that signing with a Major Junior A hockey league would jeopardize his opportunity to play amateur intercollegiate hockey under then existing NCAA rules.

Defendants cannot be expected to intervene and personally inform every player of his situation upon the execution of a contract and participation with a Major Junior A hockey team; accordingly, I hold that defendants did not owe such a duty to plaintiff.

■ Plaintiff also argues that he received only one to two days notice prior to the October 4, 1984, eligibility telephone conference hearing. Plaintiff claims such notice was insufficient for him to obtain assistance of counsel. Plaintiff never alleged, however, that he was entitled to assistance of counsel, nor has he cited any authority for the proposition that he was entitled to assistance of counsel at the October 4, 1984, hearing. Analogy to assistance of counsel requirements in welfare benefit termination cases, *see Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), is inappropriate because plaintiff has not demonstrated that he has a liberty or property interest of which he is being deprived. Even if plaintiff had demonstrated that denial of the opportunity to play hockey was a deprivation tantamount to a suspension from school for disciplinary reasons, his argument would fail. The Supreme Court has held that there need be no delay between

the "notice" and the hearing for such a suspension, nor must the school afford the student the opportunity to secure counsel.[3] *See Goss v. Lopez,* 419 U.S. 565, 582–83, 95 S.Ct. 729, 740–41, 42 L.Ed.2d 725 (1975); *see also Lee v. Western Reserve Psychiatric Habilitation Center,* 747 F.2d 1062 (6th Cir.1984) (probationary employee at state facility not deprived of due process when given notice of charge one day before hearing).

Since plaintiff has not demonstrated that he was without adequate notice that his participation in the Major Junior A hockey league would jeopardize his eligibility to play intercollegiate hockey and has not demonstrated that he had a right to be assisted by counsel at his October 4, 1984, hearing, I dismiss Count III with prejudice.

Count IV claims that defendants collaborated, cooperated and conspired to deprive plaintiff and the class of individuals who play in the Canadian Major Junior A hockey league of their freedom of association and of equal protection of the law. Based upon reasons that I stated in dismissing Count II(e), *supra,* i.e., that plaintiff's freedom of association was not deprived, I dismiss plaintiff's freedom of association claim in Count IV with prejudice.

Plaintiff's equal protection claim is based upon the treatment of players in the Major Junior A hockey league. Plaintiff has not argued that this group is a suspect class subject to strict scrutiny analysis. I hold that it is not a suspect class. Additionally, there is no fundamental interest at issue that would require strict scrutiny analysis because I have dismissed plaintiff's freedom of association deprivation claim. Thus, the applicable standard for plaintiff's equal protection claim is the rational basis test. *See Harrah Independent School Dist. v. Martin,* 440 U.S. 194, 199, 99 S.Ct. 1062, 1064, 59 L.Ed.2d 248 (1979); *San Antonio Independent School Dist. v. Rod-*

*riguez,* 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973).

Under the rational basis test defendants need only show that they had a basis "rationally related to the State's objective" for treating plaintiff differently than others. *See Harrah,* 440 U.S. at 199, 99 S.Ct. at 1064; *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 315, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976). It is undisputed that defendant NCAA's stated objective is to promote and protect amateur intercollegiate athletics. *See* Complaint, para. 50. I hold that this is a legitimate state interest, and in order to fulfill this purpose, the NCAA and its member institutions must prevent professional players from competing on amateur intercollegiate teams. The rules precluding players on professional teams from competing on intercollegiate amateur teams are rationally related to the objective of protecting amateur athletics. Accordingly, I dismiss plaintiff's equal protection claim in Count IV with prejudice.

Finally, it should be said that even though plaintiff Karmanos III has not explicitly attacked the constitution and rule promulgated by the NCAA, several of his broadly worded allegations might implicitly be said to do that. Hence, this comment. If these allegations, when taken as a whole, constitute a constitutional attack on the facial validity of the constitution and rule, I find the attack unavailing.

First, plaintiff has no constitutionally protected right, privilege, or entitlement to participate in intercollegiate hockey. *Cf. Walsh v. Louisiana High School Athletic Association,* 616 F.2d 152, 159 (5th Cir. 1980), *cert. denied,* 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981) (association rule prohibiting transfer students from competing interscholastically during the year following their transfer did not infringe a constitutionally protected right); *Mitchell*

---

**3.** Because I have determined that defendants have not deprived plaintiff of a property or liberty interest, I do not rule on whether plaintiff's letter stating his hockey experience and

reasons he should not be deemed professional constitutes a predeprivation "opportunity to explain." *See Goss v. Lopez,* 419 U.S. at 582, 95 S.Ct. at 740.

**820**

*v. Louisiana High School Association*, 430 F.2d 1155, 1157–78 (5th Cir.1970) (participation in interscholastic athletics is not a right, privilege, or immunity protected by the federal Constitution); *Hamilton v. Tennessee Secondary School Athletic Association*, 552 F.2d 681, 682 (6th Cir.1976) (citing *Mitchell, supra* for the point annotated). Second, the NCAA constitution and rule implicitly challenged by plaintiff is not so arbitrary or unreasonable as to deny plaintiff substantive due process or equal protection. The NCAA has a legitimate interest in restricting collegiate competition in amateur athletes. The constitution and rule challenged by plaintiff bears a reasonable relationship to this objective by prohibiting the participation of amateurs and professionals on the same team. This is all that due process or equal protection requires in a situation such as this. *Cf. Kite v. Marshall*, 661 F.2d 1027 (5th Cir.1981), *cert. denied*, 457 U.S. 1120, 102 S.Ct. 2934, 73 L.Ed.2d 1333 (1982); *In Re U.S. ex rel. Missouri State High School Activities Association*, 682 F.2d 147 (8th Cir.1982).

I have not addressed the issue whether defendant NCAA is a state actor, and because of the manner in which I have decided this case, I do not address that issue.

For the reasons stated in this Opinion, defendant NCAA's Motion to Dismiss and defendants' Shapiro, Canham, and the Regents' Motion to Dismiss are hereby GRANTED. In addition, Karmanos Jr. and Compuware are dismissed as stated.

An appropriate order may be presented.